CLARENCE MYERS, APPELLEE, v. PLATTE VALLEY PUBLIC POWER AND IRRIGATION DISTRICT, A PUBLIC CORPORATION, APPELLANT.

67 N. W. 2d 739

Filed December 28, 1954. No. 33587.

*Crosby & Crosby* and *Jess C. Nielsen,* for appellant.

*Edward E. Carr* and *W. I. Tillinghast,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff brought this action at law in the district court for Keith County to recover damages alleged to have been sustained by the plaintiff caused by seepage water escaping from defendant's canal reaching the plaintiff's land and destroying 12½ acres of wheat during

the 1948 crop year, and for continuing damages until the expiration of the school land lease held by the plaintiff which expires in 1959. The defendant filed a written offer prior to the time of trial to confess judgment in the amount of $2,500, which offer was refused and the cause proceeded to trial. The jury returned a verdict in favor of the plaintiff and against the defendant, fixing the amount of plaintiff's recovery in the sum of $1,100. The plaintiff filed a motion for new trial which was sustained by the trial court. From the order of the trial court sustaining the plaintiff's motion for new trial, the defendant perfected appeal to this court.

For convenience we will refer to the parties as they were designated in the district court.

That the defendant, Platte Valley Public Power and Irrigation District, is a public power and irrigation district organized and existing under and by virtue of the laws of the State of Nebraska, and particularly under the provisions of sections 70-601 to 70-679, R. R. S. 1943, is admitted.

The record shows that the plaintiff was the owner of a school land lease on the south half of the southwest quarter, and Lots 2 and 3 in Section 8, Township 13, Range 35 West of the 6th P. M., being the lease with the Department of Public Lands and Buildings, No. 653398, which expires January 1, 1959.

The plaintiff's second amended petition, insofar as the same need be considered here, alleged in substance that during 1947, the defendant constructed a canal across the south edge of the above-described real estate, taking part of said land for construction purposes, and during the rainy seasons has been transferring water from the South Platte River through defendant's canal to the place known as the Sutherland reservoir, one of the reservoirs south of Sutherland, in which water for the defendant is stored for the purpose of sealing the banks of said canals and reservoirs; that the canal above referred to was constructed by the defendant upon its right-of-way

which was acquired for public use, and that it has maintained, used, and operated the canal in the transferring of water and silt for its use, and in doing so, permitted, during high-water periods, the water to seep out of the canal and damage the crops of the plaintiff; that during June and July 1948, the water seeped out of the canal upon 12½ acres of wheat planted by the plaintiff and destroyed the crop; that the land of the plaintiff had been summer fallowed, and the average wheat grown upon the land and the lands adjoining was 25 bushels to the acre and the same sold for $1.98 a bushel; and that during the year 1948, the plaintiff was damaged in the amount of $618.75. The plaintiff alleged continuing damages for the remainder of the term of the lease in the amount of $5,000.

The defendant's answer denied the allegations of the plaintiff's petition relating to negligence on its part; affirmatively alleged that the area of plaintiff's land as alleged to be overflowed and water logged is low-lying first river bottom land of native hay meadow type and not adaptable to successful cultivation, and is subject to natural seepage and flooding during wet seasons of the year; alleged that any damages claimed to have been sustained by the plaintiff are the result of natural causes; specifically denied the same resulted from the construction, operation, and maintenance of the defendant's diversion canal; and prayed that the plaintiff's petition be dismissed.

The plaintiff's reply to the answer of the defendant was a general denial of the material allegations contained therein save and except such as were admitted in the plaintiff's second amended petition.

The plaintiff testified that he and his son, Lewis Myers, have farmed the land described in the lease since 1943. This land comprises about 20 acres of hay meadow, 40 acres of pasture land, and the rest under cultivation, except for 5 acres used as a cemetery. He first noticed coarseness in the hay in 1948. There were

approximately 179 acres in the lease. Some 20 acres had been taken by the defendant for its right-of-way across the south portion of the leased land when the canal was built in 1946. Approximately 14 acres lie to the south of the defendant's right-of-way. The plaintiff first noticed damage to his cultivated land in 1948 to a wheat crop seeded in 1947. He had difficulty with his machinery; it would mire down on a small tract which measured 12½ acres which he could not harvest in 1948. There was no difference in the soil where the crop was destroyed and in the rest of the cultivated land, and he had never before noticed seepage there. He did not harvest the 1948 crop. He has planted the land to crops since and has been unable to harvest it. The area where the seepage occurred has been getting larger. In 1948, the wheat averaged around 30 to 31 bushels an acre, and on the open market was worth $1.98 to $2 a bushel. Following 1948, the hay grew coarse and brought from $12 to $15 a ton, while good hay brought $30 a ton. He had noticed no difference in this respect prior to 1948. He testified that in his opinion the school land lease in 1948 was of the value of $9,000, or $65 an acre, and that the value of the lease in 1948, assuming the damage which he now knows to exist on the land had existed at that time, was in the amount of $4,000.

On cross-examination the plaintiff testified that there was a marked swale running east and west, meandering through his hay meadow just north of his cultivated land; that there was drainage from the hills to the south running in a northerly direction toward the river and onto his meadow land; and that following heavy rains there was a surface runoff that went down into the low places, but it did not stand any length of time. He sold his 1948 hay crop, except certain portions which he fed. He summer fallowed the 12½ acre tract in 1949, and each second year thereafter. He had never seen alkali on his land until the defendant's ditch was

constructed. He was cognizant that the Board of Educational Lands and Funds could have reappraised his land from time to time for the purpose of establishing lease rental, and that he paid a rental of 6 percent upon the appraised value, payable semiannually. He further testified that it costs from $2.50 to $3 an acre to harvest wheat, and it cost him as much to harvest his wheat with the 12½ acres out as though he had harvested his entire acreage, due to the fact that it is easier to farm straight across than to go around the 12½ acres.

The plaintiff's son testified that the 12½ acre tract was summer fallowed and cropped in 1950 and 1952. He testified that he had difficulty in harvesting; that it would be easier to work straight through the strip than to work around it; that the north line of the farm land is practically straight east and west; that a road runs along the hay meadow; and that the farm land slopes up to the south. In his opinion, the school land lease was worth around $10,000 in 1948, that was before there was any wet land on it, and, from his knowledge of the land, he testified that in his opinion it was worth, at the time of trial, $3,500. On cross-examination he testified that the 1948 yield of wheat on this land was 1,968 bushels; the 1950 yield was 1,988 bushels; and the 1952 yield was 2,606 bushels. In 1950, they had the heaviest yield of hay on the meadow, in tonnage, that they had ever had. This was due to a wet year. He also testified that there was a drainage area across the farm land from the south to the north, but water hardly ever stayed on this land, as it progressed down the slough or swale north of the cultivated land. He had never known of alkali spots along this swale until 1948. The village of Paxton purchased 5 or 6 acres for cemetery purposes, which he and his father farmed as a part of their tract.

A witness for the plaintiff testified that he had put up hay on the land in question in 1945, and every year

since until 1951. From 1948 to 1951, the hay was heavier where the land was wet and soggy. He observed that a portion of the wheat crop in 1948 was not cut, but there were weeds in that area. From his knowledge of the wet hay meadow and assuming that the 12½ acres of wheat land were not harvested, in his opinion the value of the lease would be depreciated to 45 percent of what it was before. This depreciation was largely due to the fact that the hay meadow became wet and water logged.

A witness testified to the yield on his wheat land located approximately a mile to the west and being similar in character to the land in question, and that he obtained 25 to 40 bushels per acre on his land. He was acquainted with the land the plaintiff farmed, and up to 1948 it was all farmed. In that year there was a small patch toward the north of the cultivated tract that did not look too good, and this condition has existed in that place since. He had never known of alkali on this land until 1948, but there was alkali about a mile west on the Stafford land or the Pielstick land. He further testified that the original name of Paxton, Nebraska, was Alkali, due to the alkali lands surrounding Paxton.

Another witness, acquainted with the land in question and who had farmed for a number of years west of such tract, testified that the land in question had been farmed to wheat ever since he had known it, and that there always was a spot along the north side that was not harvested. He had observed this condition since the ditch was put in. He further testified that, assuming that there had never been any damage on the land prior to 1948, the same at that time would have been worth from $60 to $70 an acre; and assuming that the 12½ to 14 acres had been damaged by water logging from 1948 to the date of termination of the lease, in his opinion the reasonable value of the lease following such damage as alleged would be around $4,000. On cross-examination this witness testified that he did not know that in 1938 the small area of cultivated land com-

plained of in this action was not harvested, and that later, in 1940 and 1941, the same area could not be harvested due to the wet condition.

A witness residing 5 miles south of Grant, Nebraska, who had previously lived in Keith County half a mile west of Paxton, testified that he had put up hay on the land in question from 1949 to 1951, and observed that the hay was getting more rank and coarse during this period of time.

Another witness who lived south of Madrid, Nebraska, testified that in 1944 he lived south of Paxton, was acquainted with the land in question, and put up the hay in 1944. This witness harvested the 20 acres of meadow and obtained approximately 30 tons of good quality hay. The wheat crop on the cultivated land was all harvested that year. On cross-examination this witness testified that he recalled a swale or slough; that it did not run up to the wheat lands, but was back a ways; that he could drive along the road south of the meadow lands; and that he had never noted any marked erosion from the surface runoff waters through what is now the plaintiff's cultivated area.

Another witness who resided 10 miles south of Paxton testified that he had been acquainted with the land in question for from 20 to 50 years; that his wife owned land 1½ to 2 miles west of plaintiff's land; that he had noticed a portion of the land in question that did not produce a crop prior to 1948; and that he observed a hay crop on his hay meadow land to the west which had been harvested each year and the greater part of the hay had appeared to grow more coarse since 1948 or 1949.

A witness who had known the tract of land in question for about 8 years and had put up hay on it in 1942, when it was being farmed by a different person, testified that the hay was of good quality only that the sweet clover was a little too big. He had harvested about 20 acres of the meadow and it measured 34 tons.

The tenant at that time had oats in the cultivated area adjoining the hay meadow to the south, and he cut all of the oats. He had no occasion to observe this land since 1942. He did purchase a load of hay from the plaintiff in 1949, and it appeared to be somewhat coarser. In his opinion the lands of this school land lease were worth in 1948, before there was any damage apparent from the water, about $60 an acre. He had no knowledge of the condition of the land subsequent thereto.

The defendant offered the testimony of a state land appraiser for the Board of Educational Lands and Funds who identified the school land lease in question. He was acquainted with the land by previous examination, and had known the same since 1942 when he first inspected the land. Later an inspection had been made by Mr. Dillon, and in 1951 the land was again inspected by this witness. He explained how the appraisal was made by an examiner and how the land was classified and the values arrived at on the inspection and the classification over a period of 10 years, and that reappraisals are had for the purpose of establishing rental on the land. In re-appraising, sometimes the classification of the land is changed, either the same is raised or lowered for lease purposes, but this fact does not establish market value. He testified that the semiannual rent on the land in question was $111.75, based on 6 percent of the reappraised valuation as placed upon this property by the records in his office, which valuation was subject to change. He further testified that the type of soil generally was a sandy loam, but in the very low spot which comprised approximately 12 acres, he was not sure that it was sandy loam, but was inclined to think that it was underlaid with a clay subsoil which might form a hard pan. He further testified that he was certain that at least a portion of the seepage water came from the canal because there were traces of it showing down through the field which indicated that there was a seepage coming from that source, and that

there was approximately 12 acres where the seepage occurred. In 1942 he did not notice any seepage, but he was certain that there was one place in 1951 where he had noticed seepage.

The office manager for the defendant, who had been employed by the district since 1934, testified as to the construction of the South Platte diversion canal in 1945 and 1946; that the first water run into the canal was in November 1946; and that the South Platte River carried a lot of silt and clay in its water and the canal was built primarily for the purpose of bringing this silt-bearing water into the system to seal its canals and reservoirs and for the purpose of preventing loss from seepage. He had been acquainted with the tract of land in question since 1935, and in connection with engineering work for the district had obtained aerial photographs of all lands through which the district's canals run and of the reservoirs from Lake McConaughy to Kearney. He testified with reference to the aerial maps. All of this testimony was in detail with the use of exhibits, and gave the jury a comprehensive picture of the land in question. We deem it unnecessary to relate this testimony in this opinion.

A witness living in Paxton who had lived 2 miles south and 1½ miles west of Paxton, employed by the village of Paxton through the cemetery board and who was in charge of digging graves and caring for funerals since 1945, described the manner in which he dug the graves, the depth of the same, and testified that he had never encountered any soil condition which would indicate seepage. He was acquainted with the land in question, and had cut oats on the cultivated land in 1932 and 1934. He further testified that part of the land north of the cemetery along the north portion of the cultivated land was "wet and miry," and he was unable to harvest it.

A resident of the Paxton vicinity since 1911 testified that he had been acquainted with the land in question during all of those years. In describing this land he tes-

tified that the low land on the tract in question was subject to alkali, and that he did not observe any particular difference in this land in its productivity during the years prior to and following 1948. Some years the crop was good and some years poor. He further testified that he had observed, during the years, 12 to 15 acres toward the north edge of the tract that became soggy and water logged; that this area had been of a similar condition during the years; and that he had noticed no particular difference in recent years.

A witness who had known the land in question for 45 years, had been an owner of land in the county for 43 years, and had rented land along the North Platte River, testified that he had been over the tract of land in question recently and there was quite a little alkali on the bottom land. He had observed the hay meadow and the cultivated area, and testified that along the north portion of the cultivated land, when they have heavy rains in the spring, the alkali shows up and it is not possible to raise a crop. In the event there is a dry spring, a good crop may be raised. In wet seasons, since he has known the land, portions of the low land were water logged. In recent years some of the cultivated land, he noticed, was not harvested. This was true also in the earlier years along the north side and next to the bottom land. He had observed the swale across the land and the low places on the farm land, and in wet years these areas turned white. Alkali came to the top and turned the land white both on the meadow and on the farm land. This would generally show up early in the spring and summer, depending upon the rainfall.

The superintendent of the hydraulic department of the defendant district since 1941 testified that he worked on a survey crew for the district in 1934, and in this capacity had been over the cultivated area in this tract of land. In 1934 there was an area located from 100 to 200 feet west of the state highway and down near the meadow land that was not harvested. He ran the initial

survey for the defendant, and observed this tract of land at that time. About two-thirds of the way toward the west there was a draw that they had to go around. Since the ditch was constructed, the swales coming from the south through the fields have disappeared and they are farmed over, the surface floodwaters having been cut off by the canal. He was over the land in 1942 surveying, and the alkali was predominant on the surface of the ground along the low-lying areas. He knew that portions of the lower land were not harvested, and this occurred almost every year.

A witness who had lived in Lincoln County near North Platte for a period of over 53 years on lands along the South Platte River and who owns land adjoining the river, testified that he had been employed by the defendant since 1934 as a geologist and had supervised borings for the footings and structures of the canal excavation. He had made borings throughout the area and through damaged areas for the purpose of constructing drain ditches. He had known the tract of land in question since 1934, and made a personal examination and investigation of the type of soil on this land. From his examination he found the upland soil to be a sandy loam and the lower area to be a silt loam. He also had made borings on the land some 200 or 300 feet north of the north line of the cemetery and had encountered a clay layer that was impervious to water generally. He had observed evidence of alkali salts over this land, especially along the north portion of the cultivated field. He had also observed the swale or slough running through this tract of land, and near the west end it turns to the north and enters the pasture land. This slough serves as a natural drainway for the runoff surface waters from the south. He did not observe any erosion that would inconvenience farming. He identified an exhibit which reflected surveys and measurements made in the area in question in this case. From that exhibit, for the year 1947, there is reflected an unhar-

vested acreage of 5.55 acres; the 1948 measurement reflects an unharvested acreage of 12.74 acres; for the year 1949, an unharvested acreage of 5.6 acres; for the year 1950, an unharvested area comprising 6 acres; for the year 1951, it reflects the entire cultivated area seeded to wheat and the tract of land involved as showing white alkali; for the year 1952, it reflects an unharvested acreage of 3.5 acres; for the year 1953, the entire cultivated area as summer fallowed; and on June 16, 1953, no evidence of wet land in the area involved. There is other evidence by this witness to the effect that he was acquainted with prairie and meadow grasses; that he had been over the meadow and pasture on the land in question several times; and that the grasses grown there were the western wheat grass, gramma grass, and blue stem, side oats and gramma grass predominate. He had examined the meadow recently and at the time of trial there was an extensive growth of gramma grass with seed flags on it. This grass seeds twice a year, in the spring and after the harvest the seeds come on again a second time. The same type of gramma grasses appear on the table lands. As to these native grasses, in an extremely dry year there is a lighter cutting but a finer quality of hay, and in wetter years a heavier growth of hay but of poorer quality.

Prior to the defendant resting its case, request was made that the jury be sent to the premises involved under proper instruction by the court for the purpose of assisting the jury in arriving at a determination of the issues. This request was granted and the jury viewed the premises in question.

The plaintiff, in his motion for new trial, did not take exceptions to the instructions given by the trial court. The motion for new trial set forth that the jury erred in the assessment of the amount of recovery, in that it was too small, the action being for injury to property and to property rights; that the jury disregarded the instructions of the trial court, and the verdict was the

result of bias and prejudice; and that the verdict was arrived at and influenced by and through personal favoritism of the jurors toward the defendant, in utter disregard of the law and the evidence presented, preventing the plaintiff from having a fair and impartial trial.

The defendant assigns as error the following: (1) That the court's ruling in setting aside the verdict of the jury and granting a new trial was not justified by the record. (2) That the court's ruling was an abuse of judicial discretion and not based upon or sustained by any legal principle applicable to the facts in this case. (3) That no exceptions in the motion for new trial had been taken to any of the instructions as given by the court and that by said instructions the disputed issues of fact were fairly submitted to the jury and resolved and determined by the jury in a manner favorable to the defendant, though said verdict was in favor of the plaintiff, and no error in the record being pointed out, the court's finding and order sustaining the motion and setting aside the verdict were an abuse of judicial discretion and an invasion of the province of the jury.

In this connection, the following authorities are pertinent to this appeal.

In Greenberg v. Fireman's Fund Ins. Co., 150 Neb. 695, 35 N. W. 2d 772, this court said: "A new trial is to be granted for a legal cause and where it appears that a legal right has been invaded or denied. A new trial is not to be granted for arbitrary, vague, or fanciful reasons. Tingley v. Dolby, (13 Neb. 371, 14 N. W. 146) supra; Missouri Pacific Ry. Co. v. Hays, 15 Neb. 224, 18 N. W. 51; Wagner v. Loup River Public Power District, ante p. 7, 33 N. W. 2d 300.

"The power of judicial discretion authorizes and requires the court to determine the question as to whether or not a legal reason exists for the granting of a new trial. If a legal reason exists and the complaining party makes his application in writing within the time fixed

by statute the court has no discretion in the matter and the motion must be sustained. If a legal reason does not exist the court has no discretion in the matter and the motion must be denied. Tingley v. Dolby, supra; Bradley v. Slater, 58 Neb. 554, 78 N. W. 1069."

The Supreme Court is not vested with authority by the Constitution or laws of the state to set aside the verdict of a jury, having for its support sufficient competent evidence, even though this court may be of the opinion that had it been the trier of the case, it would have reached a different conclusion. See Risse v. Gasch, 43 Neb. 287, 61 N. W. 616.

While the trial judge need not give his reason for reaching a decision, the justification of the decision must be one that can be established from the record. See Greenberg v. Fireman's Fund Ins. Co., *supra.*

"Where a party has sustained the burden and expense of a trial and has succeeded in securing the judgment of a jury on the facts in issue, he has a right to keep the benefit of that verdict unless there is prejudicial error in the proceedings by which it was secured." Greenberg v. Fireman's Fund Ins. Co., *supra.*

In the instant case no exceptions were taken to any instructions given by the trial court, and the plaintiff has made no attempt to point out in the motion for new trial any error in the giving of instructions by the trial court, and the same are not urged as being erroneous in this appeal.

The rule is that instructions not complained of in such a way as to be reviewable in this court will be taken as the law of the case, and if, when tested by such instructions, the verdict is not vulnerable to the objections lodged against it, the assignments will not be sustained. See, Skinner v. Wilson, 76 Neb. 445, 107 N. W. 771; Webber v. City of Scottsbluff, 150 Neb. 446, 35 N. W. 2d 110.

It is also the rule that it is presumed a jury followed the instructions given in arriving at its verdict and, unless it affirmatively appears to the contrary, it cannot

be said that such instructions were disregarded. See Missouri Pacific Ry. Co. v. Fox, 60 Neb. 531, 83 N. W. 744.

We have previously set forth certain items contained in the plaintiff's motion for new trial relating to the proposition that the verdict of the jury was returned through passion and prejudice and in violation of the substantial rights of the plaintiff. In this connection the plaintiff, by an affidavit appearing in the transcript, which does not appear in the bill of exceptions, showed the relationship of certain jurors to public power districts. This affiant was Melvin Allen who stated that in 1939, 1940, 1941, 1942, and 1943, he worked in the employ of different construction contractors in the construction of the Kingsley Dam; that Herbert Davison, one of the jurors, worked for and was in the employ of the Martin Wunderlich Company, one of the construction contractors on the dam; that S. A. Spoeneman, one of the jurors, was employed and worked in the capacity of guard at the dam for the Central Nebraska Public Power and Irrigation District; that Roy Peters, one of the jurors, was employed by and worked for the Central Nebraska Public Power and Irrigation District; and that Harry Suhr, one of the jurors, was employed by one of the construction companies working at the dam.

The amount of damages sustained by a landowner for a right-of-way condemned across his land is peculiarly of a local nature to be determined by a jury and this court will not ordinarily interfere with the verdict if it is based upon the testimony. When the evidence is conflicting, the verdict of the jury will not be set aside unless it is clearly wrong. The jurors are the judges of the credibility of witnesses and of the weight of their testimony. See Kennedy v. Department of Roads & Irrigation, 150 Neb. 727, 35 N. W. 2d 781. We find the assignment of error that the verdict was rendered through bias, passion, prejudice, or favoritism is without merit.

We conclude that the plaintiff had a fair and impartial trial, and the trial court abused its sound judicial discretion in granting a new trial. The defendant made a bona fide offer to settle this cause prior to the time of trial, which was refused.

For the reasons given herein, the order of the trial court in sustaining the plaintiff's motion for new trial and setting aside the verdict of the jury is reversed and the cause remanded with directions to the trial court to reinstate the verdict of the jury and to enter judgment thereon. The costs incurred in this appeal and as incurred in the district court after the offer to confess judgment was made are to be taxed to the plaintiff.

REVERSED AND REMANDED WITH DIRECTIONS.