FRANCIS J. PIEPER ET AL., APPELLEES, V. CITY OF SCOTTSBLUFF, NEBRASKA, A MUNICIPAL CORPORATION, APPELLANT.

126 N. W. 2d 865

Filed March 13, 1964.    No. 35501.

Loren G. Olsson and Marvin L. Holscher, for appellant.

Rush C. Clarke and Neighbors, Danielson & Van Steenberg, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The City of Scottsbluff, a municipal corporation, brought this action in the county court of Scotts Bluff County to condemn certain land owned jointly by Francis J. Pieper and Louise Pieper, husband and wife as joint tenants in fee simple of said land. The purpose of the taking was to enable the city to construct, maintain, and operate on the land taken several sewer lagoons, mains, structures, and equipment appurtenant thereto, to be used in supplying public sewer service to the inhabitants of the city and others to whom the city by law is authorized to supply such service. The city sought to take the fee simple title to a certain part of the Pieper land. Appraisers were appointed by the county judge and made a report in writing assessing the damages sustained by the Piepers in the amount of $50,470, and the damages sustained by the tenant, Leo Stricker, at $5,775. The

city deposited the amounts of these awards in the county court. The city appealed to the district court. The case was tried to a jury in the district court resulting in a verdict in favor of the Piepers in the sum of $64,170, and in favor of Leo Stricker, the tenant, in the sum of $5,775. The city filed a motion for new trial which was overruled. The city perfected appeal to this court.

Judgment was rendered upon the verdict in favor of the plaintiffs for the sum of $41,411.87, being the sum of $64,170, less $25,000 previously withdrawn by the Piepers from the amount that had been deposited by the city, pursuant to the city's offer to stipulate therefor, plus interest, and costs. Judgment was rendered in favor of Leo Stricker, tenant, for $6,074.01, being the sum of $5,775 plus interest, and costs.

We will refer to Francis J. Pieper as Pieper or plaintiff, and on occasions, if required, we will refer to Pieper and his wife as plaintiffs; to Leo Stricker as tenant; and to the City of Scottsbluff as the city or defendant.

The only issue tried was the amount of damages sustained by the plaintiffs and the amount of damages sustained by the tenant as a result of the taking.

The defendant set forth many assignments of error which need not be enumerated. Such assignments as necessary to a determination of this appeal will be taken up in the opinion.

The farm owned by the Piepers at the time of the taking by condemnation by the city on March 20, 1962, consisted of approximately 266.53 acres adjoining the North Platte River on the north, and 2½ miles southeast of the city. In addition to the cultivated land, the farm consisted of pasture, wetland range, marshland, channels of the North Platte River, gravel deposits, and an area occupied by the main irrigation canal and subject to an easement in favor of the Minatare Mutual Canal and Irrigation Company. The farm consisted of two tracts of land, one lying north and the other south of the tracks of the Chicago, Burlington, and Quincy Rail-

road Company which owned a 150 to 200 foot right-of-way.

Pieper's father bought this land in 1910, and Pieper has lived on it for 49 years. The plaintiff's father leveled the land north of the railroad tracks. When the plaintiff became the owner of the land, he rear-ranged the whole farm so that it would irrigate better. The land is now all level so that he can run water 80 rods without cross ditches. There was a four-room house on the Pieper farm which the plaintiff's father made into a two-story house by adding four bedrooms upstairs. A kitchen with a basement under it was also added. This construction took place about 1914. A year or so prior to the trial, a new foundation was built under this house, and it was completely insulated and remodeled. There is a granary with a machine shed attached, a brooder house, a garage and television repair shop, a chicken house which accommodates 300 to 400 laying hens, and a dairy barn of a 20-cow capacity with a shed and calf barn attached thereto. A tenant house was built in 1950, and a substantial addition made to it. The size of the tenant house was almost doubled by the addition. The tenant house has two bedrooms, bathroom, dining room, living room, kitchen, utility room, and a 24 x 24-foot basement. Pictures of the plaintiff's residence and the tenant house in evidence disclose that they are well constructed and modern in every respect.

The land taken by the condemnation proceeding was a tract lying south of the right-of-way of the railroad consisting of approximately 138.24 acres, including 30.92 acres of cultivated land; 33.63 acres of irrigated pasture; 1 acre of marshland; 5 acres of land occupied in part by the canal and subject to the easement of the canal company, being 5 of the 9.51-acre right-of-way of the canal company; 9.9 acres of high pasture; 36.64 acres of wetland range, including islands in the North Platte River; 13.55 acres of river channels; and 7.6 acres comprising an area in which there are two lakes and gravel deposits.

The tract was severed approximately midway between its northern and southern boundaries by the marshland and the canal. Of the 9.51 acres comprising the canal, its excavated banks and adjoining land, the west 4.51 acres were owned by the canal company, but approximately 3.5 acres of the east 5 acres that were subject to the easement of the canal company were useable by the plaintiffs.

All of the improvements heretofore mentioned were north of the railroad tracks and were not taken in the condemnation proceeding. This tract consisted of 128.29 acres of cultivated land and the improvements thereon.

The lagoons were to be operated and maintained by the city within the area lying between the railroad right-of-way and the right-of-way of the canal company. Sewage from the city would enter the lagoons at the bottom. The bottom and dikes would be sealed with an impervious coating to prevent seepage, and the sewage solids would be destroyed by a natural, odor-free process of photosynthesis.

William L. Bredar, a consulting engineer engaged in sanitary engineering, testified that the odor ordinarily would be limited to a faint musky smell that would be noticeable when standing on the bank; that usually there would be no odor at 100 feet distance; that there might be some additional odor for a 2-to-4-week period in the spring while ice was melting; that the odor is mild and ordinarily would not be detectable beyond a distance of 500 to 600 feet; that in the case of a strong wind the odor would not travel more than 1,000 feet; that lagoons constructed in the manner in which the city would construct the same would not create objectionable odors; and that the lagoons would be approximately half a mile distant from the buildings on the land not taken and would not be visible from them. It appears that freedom from odor apparently depends on the level at which the sewage is kept. If the sewage falls below or rises above the depth of 3 feet, this expert believes such varia-

tion would have a bearing on the odor problem. He further testified that the lagoon or sewage lake is designed to handle all sanitary sewage, consisting of human excretions and waste, including industrial waste, originating in the city of Scottsbluff, a city of 13,000 or 14,000 population. The lagoon is designed to handle the increasing population of the city during a 20-year period.

George J. Wright, an expert witness properly qualified to testify as to values, testified in behalf of the plaintiffs. He gave as his opinion that the fair and reasonable market value of the real estate taken by the city on March 20, 1962, was $32,000. In fixing this amount he did not include the presence of gravel on such land, but stated that it would have an effect upon his opinion as to the value. As to the 128.29 acres not taken in the condemnation proceeding, he gave as his opinion that the market value of such land before the taking was $91,974, $76,974 for the land and $15,000 for the buildings. He stated that the fair and reasonable market value of the land after the taking, including the improvements, in his opinion was $71,645, which did not include severance damage, the difference in value before and after the taking being $20,329. Relating to the depreciation by reason of the separation of the farm, this witness testified that a combination unit consisting of a farming activity and a livestock program is in demand by top farmers and businessmen who finance that type of program, and that by losing the livestock program from the land actually taken, it puts the farm into a direct farming program. This being so, the farm cannot be operated as a unit, consequently it cannot support the cost as it could when used as a unit. The loss of the acres taken would depreciate the value of the acres not taken. The unit being dropped down to 128.29 acres could not support the amount of improvements on the land. On cross-examination this witness was asked about and testified concerning other sales where comparable prices were paid and one sale where the price paid was $1,000 an

acre. He did not consider that land comparable to the Pieper land.

William S. Bitner testified for the plaintiffs that he is a licensed realtor in Nebraska and Wyoming; that he has known the Pieper land since before engaging in the real estate business; that he had bought and sold real estate in the immediate vicinity of the Pieper land; that he sold two farms right across the road from such land; that the land lying north of the railroad tracks on which the buildings and irrigation well are located is equal to any land in the valley; that the production of this land is excellent; that the lay of it is excellent; and that it could be irrigated clear through for farming if one desired to make it so. This witness further testified that the reasonable market value of the farm before the taking was $143,672.50; that the 128.29 acres of highly productive land north of the railroad tracks he valued at $600 an acre, the total being $76,974; the cultivated land south of the railroad tracks, 30.92 acres, he valued at $475 an acre, total $14,687; the 33.63 acres of irrigated pasture he valued at $300 an acre, total $10,089, without leveling such land; the 9.9 acres of high pasture land he valued at $250 an acre, total $2,475; and he valued the 57.79 acres of wet pasture and gravel at $250 an acre, total $14,447.50, plus loss of the right to lease for hunting $4,000, total $18,447.50; making the value of the land south of the railroad tracks a total of $45,698.50.

Amos Morrison who had lived in the Mitchell valley since 1908, had engaged in farming and feeding livestock, was a landowner, and who had bought land but not sold any, testified for the plaintiffs that he had observed the sale prices of real estate in the vicinity in which he lives and over the county. He was one of the appraisers appointed by the county court to appraise the Pieper land and assess the damages, and was familiar with such land. This witness did not take into consideration all of the uses which might be made of the land, nor did he take into consideration the gravel de-

posits. Without considering the value of the land by reason of the gravel deposits, he gave as his opinion that the total value of the land taken was $40,970. He testified that in his opinion the land not taken had a value of $600 an acre before the taking and $500 an acre after the taking. He valued the improvements at $15,000 before the taking and $7,500 after the taking. He also pointed out that the land north of the tracks would be reduced in value because in the general practice of farming and feeding such combination is important for the reason that the farmer can use cheaper feeds and at the same time be able to feed cattle on the pasture; that a tenant would be more interested in the land if he had a pasture on which to run some cattle; and that by reducing the acreage, as was done by the condemnation proceeding, and dividing the land when it had been used as one unit, this would lessen its value. This witness also stated that his figures did not include what he considered to be severance damages.

Pieper in his testimony used 120 acres for the cultivated land north of the railroad tracks instead of 128.29 acres, and 30 acres for the cultivated land south of the railroad tracks instead of 30.92 acres. He fixed the fair market value of the farm before the condemnation proceeding as follows: 30 acres of cultivated land south of the railroad tracks at $600 an acre, total $18,000; 33 acres of irrigated pasture at $350 an acre, $11,550; 10 acres of high pasture at $150 an acre, $1,500; 3.5 acres of Minatare canal right-of-way at $150 an acre, $525; 56 acres of wetland range $61,000; total market value of the land actually taken $92,575. He fixed the value of the land north of the railroad tracks, not taken, 128.29 acres of cultivated land at $600 an acre, $76,974; the Pieper home $10,000; the tenant house $11,000; all other buildings $10,000; and the total value of the land north of the tracks, including improvements, $107,974. This witness testified that in his opinion the fair and reasonable market value after the taking was $450 an acre; that the

diminution in the value of the buildings and improve-
ments, by reason of the taking, was $15,500. The rea-
sons given by Pieper as to his opinion that the land not
taken was diminished in value by the taking to the
extent of $34,743.50, were because the farm, being a
combination farm, was made smaller and eliminated the
dairy prospects which would cause the farm not to be
operated efficiently; that the same amount of equipment
was there but could not be used to make the equipment
pay off; that the farm thus divided would be insufficient
to support two families and two sets of improvements;
that there would be no use for one house; that it would
be difficult to obtain a tenant for a farm of this nature;
that a tenant would be required to live next door to an
open lagoon; and that the loss of the pasture land had
taken approximately half of the income of the farm.
Pieper gave as his opinion that the reasonable market
value of the wetland range which the city took south
of the railroad tracks to be used for a sewage disposal
plant was $61,000.

The tenant, Leo Stricker, who had lived all his life on
farms in Scotts Bluff County, testified that he was ac-
quainted with other farms in the county; that the Pieper
farm was a number one farm for the reason that the
irrigated pasture is real good pasture and more cattle
can be run on this land than on land not irrigated; that
the irrigated pasture has strawberry clover and other
types of grasses and has been regularly irrigated; that
the wetland range contains good grasses with plenty of
submoisture; that he ran from 100 to 125 head of cattle
on this land; that the crops were rotated on the land
north of the railroad tracks in a scientific manner, and the
land was highly productive; that he would be unable to
find another place like the Pieper farm to rent; that in
his opinion the difference between the rental value of this
farm for the remainder of the 1-year term, March 1962
to March 1963, and the rent called for by the lease was
$10,000; and that for the past 5 years half of his income

had come from the land south of the tracks. He further testified that he had been running 100 or more head of cattle for 5 months each year on the pasture land, which had put an average of a 225-pound gain on each animal during those 5 months. On this basis, he was putting on $61.31 worth of gain on each steer during the time the animals were on this grass. He further testified that he cleared $5,731 out of the pasture over and above his rent during the year. The rent on the pasture land was $400 a year. He further testified that the beet crop ran 12 tons to the acre and that he would have received three-fourths of this or 9 tons on 20 acres at $15 a ton, or $2,721.60, plus $120 for half of the beet tops at $1 a ton, making a total of $2,841.60. His expenses would have been $610, leaving him a profit of $2,231.60. He further testified that there would have been 10 acres of beans which would have yielded 40 bushels or 1,800 pounds an acre, worth $130.50 an acre, or $1,305 altogether, less the expense of $122.50, leaving a profit of $1,182.50 on the 10 acres of beans; and that the total, considering the cattle, the beans, and the beets would amount to $9,145.35. He gave as his opinion, considering all of these matters regarding his lease, that he sustained damages in the amount of $10,000.

Wright further testified that in his opinion, concerning the difference between the rental value of the Pieper farm during the 1-year term and the rent provided for in the lease, the difference or damage to the tenant would amount to $6,005.30.

Morrison further testified with reference to the lease, that the tenant would lose $5,775, which the tenant would have a reasonable chance of netting from the land taken, had the taking not occurred; and that the lease, including the provisions for rent, was standard in the community.

The city produced competent witnesses with experience relating to all phases of real estate and farm lands, and who were familiar with the Pieper land and other

real estate in the county, the sales made therein, and who had inspected the Pieper land and the improvements thereon. Orville Brandt testified that the fair market value of the 128.29 acres, together with the improvements thereon north of the railroad tracks, before the taking by the city, was $620 an acre, or a total of approximately $79,540, and after the taking $580 an acre or a total of approximately $74,410; and that the total difference in value of the land and buildings before and after the taking would be $40 an acre or a total of $5,130. This witness further testified that the Pieper land was good land. He fixed the value of the land taken and the decrease in the value of the land remaining at $25,175.

Howard N. Hall, a witness for the city, testified concerning the fair market value of several tracts of land which included the tracts taken and, considering all uses to which the land could be put, that is, reasonably adaptable thereto, that the fair market value of the land taken was $21,465; that the fair market value of the 128.29 acres of land, together with the buildings thereon before the taking was $550 an acre or a total of $70,559.30, and after the taking $500 an acre or a total of $64,145; and that the total difference in value of the land and the buildings before and after the taking was $50 an acre, or a total of $6,414.50.

Another witness for the city, Melvin Bennett, testified concerning the fair market value of the several tracts of land taken, having in mind all of the uses to which the land was reasonably adaptable, that the fair market value of the 128.29 acres of land, together with the buildings thereon, before the taking was $550 an acre, and after the taking was $550 an acre; and that there was no difference in the value of the land and the buildings after the taking.

Keith Eberhardt, the county highway engineer, testified concerning the existing supply of gravel in the county, the number of producing gravel pits, and the reserve supply of gravel; that the gravel to be used by

the county in that part of Scotts Bluff County lying east of the city of Scottsbluff and north of the river would be between 3,000 and 5,000 yards annually, for which the landowners would receive from $150 to $500; and that the county had a 3-year stockpile at a farm 1 mile east of the Pieper farm.

There is also evidence that there was $50 worth of gravel sold from the Pieper farm about 10 years before the trial; and that no one had tried to buy gravel from Pieper during the last 20 years, or since the air base was constructed.

With reference to the damages suffered by the tenant, Stricker, Mr. Brandt, a witness for the city, testified that the provisions for crop rent were typical of farm leases in that area; that the provisions as to pasture rent vary; that the landlord usually furnishes a share of the fertilizer; and that the provision in the Stricker lease wherein the landlord furnishes half of the fertilizer did not make such lease any more valuable than a typical farm lease in that area.

Hall further testified that the provisions of the Stricker lease were standard in comparison with the generally prevailing rents of similar farms; that such rents represented the fair rental value of the Pieper farm; and that the lease had no value as a lease and no fair market value, because it was not any better than any other lease.

Bennett further testified that the provisions of the Stricker lease were practically the same as the generally prevailing provisions of other leases in the vicinity, with the exception of the provisions as to the beet tops and the pasture rent; that with respect to the beet tops, it is quite customary for the tenant to receive all of them, whereas under Stricker's lease he received only half; that the provision for $400 pasture rent was, in his opinion, a little lower than the usual provision in a lease; and that because of this advantageous feature the Stricker lease, in his opinion, might be worth $200 to $300.

There are certain established rules in this jurisdiction relating to condemnation cases as follows.

"The measure of damages for land taken for public use is the fair and reasonable market value of the land actually appropriated and the difference in the fair and reasonable market value of the remainder of the land before and after the taking." Leffelman v. City of Hartington, 173 Neb. 259, 113 N. W. 2d 107. See, also, Armbruster v. Stanton-Pilger Drainage Dist., 169 Neb. 594, 100 N. W. 2d 781. In this case the court also said, quoting with approval from Quest v. East Omaha Drainage Dist., 155 Neb. 538, 52 N. W. 2d 417: " 'The words, "or damaged," in Article I, section 21, of the Constitution of Nebraska, include all actual damages resulting from the exercise of the right of eminent domain which diminish the market value of private property.' "

In Twenty Club v. State, 167 Neb. 37, 91 N. W. 2d 64, this court said: "In condemnation proceedings, where persons are shown to be familiar with the particular land in question, they may be permitted as witnesses to testify as to the value of the tract immediately before and immediately after the appropriation."

The general rule is that the burden of showing the damages which the landowner or lessee will suffer rests upon him while the burden is on condemner to show matters which tend to reduce or mitigate the damages. See Platte Valley Public Power & Irr. Dist. v. Armstrong, 159 Neb. 609, 68 N. W. 2d 200.

In Sump v. Omaha Public Power Dist., 168 Neb. 120, 95 N. W. 2d 209, quoting from Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168, this court said: " 'The market value of property includes its value for any reasonable use to which it may be put. If, by reason of its surroundings, or its natural advantages, or its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which made up this adaptability may be shown, and the fact of such adaptation may be taken

into consideration in estimating compensation. The proper inquiry is, what is its fair market value in view of any reasonable use to which it may be applied and all the reasonable uses to which it is adapted?' * * * The evidence, however, must be limited to the adaptability of the land for uses that may be reasonably expected in the immediate future. In 18 Am. Jur., Eminent Domain, § 244, p. 880, the rule is stated as follows: 'In other words, the owner is to be given, by way of compensation for his land, its fair price for any use for which it has a commercial value of its own in the immediate present or in reasonable anticipation in the near future.' See, also, 29 C. J. S., Eminent Domain, § 160, p. 1024."

The city contends that, over objections and motions to strike, the testimony of Pieper was permitted to the effect that 2 or 3 months after the city had taken his land, one Nietfeld offered to purchase gravel from Pieper at 9 cents a cubic yard; and that in December, following the taking of his land by the city, one Kimball wanted to put on a gravel pump and pump gravel from the wetland, for which he offered to pay 9 cents a cubic yard. Kimball testified that in his opinion there were 25 or 30 feet of gravel under the land and that he could pump 300 cubic yards a day. Stricker testified that the wetland range was underlaid with gravel beginning at a depth of 1 foot to 18 inches below the surface. Pieper testified to similar effect, and further that gravel had been pumped or otherwise observed down to 25 to 35 feet below the surface; and that in his estimation he could probably sell gravel in the amount of $7,000 to $8,000 a year from the gravel deposits on his land.

The city contends that the testimony that Nietfeld and Kimball wanted to purchase gravel and the prices offered by them was inadmissible for the reason that such evidence constituted an attempt to show loss of anticipated future profits; it constituted an attempt to value the property for a particular purpose; it constituted an attempt to show market for gravel that did not exist at the time

the land was taken; and it constituted an attempt to enhance damages because of loss of intended future use.

In Medelman v. Stanton-Pilger Drainage Dist., 155 Neb. 518, 52 N. W. 2d 328, this court cited 18 Am. Jur., Eminent Domain, § 242, p. 878, to the effect that when the land taken has valuable deposits of gravel, or is covered with growing crops, these circumstances may be considered so far as they affect the market value of the land, but part of the realty cannot be separately valued for its materials, as an item additional to the value of the land for the purpose of sale. See 29 C. J. S., Eminent Domain, § 174, p. 1043. The court went on to say that under this principle the defendants could introduce evidence to show that the lands involved contained gravel deposits of such character that they were adaptable to commercial development and show the fair market value of the lands in view thereof. This they did.

In the instant case there is evidence to the effect that the lands taken contained gravel beds adaptable for development and profitable commercial production, and such fact could be considered by a witness in placing a value on the land.

The owner may show all reasonable uses to which he thinks the lands are adaptable and what the lands are worth in view thereof. If, as a result thereof, there is conflict in whether the lands are adaptable for certain use it is up to the jurors to determine which of the two views they believe. See, State v. Dillon, 175 Neb. 444, 122 N. W. 2d 223; Edwin Moss & Sons, Inc. v. Argraves, 148 Conn. 734, 173 A. 2d 505; State v. Noble, 6 Utah 2d 40, 305 P. 2d 495.

The witness Kimball testified that after hearing of the gravel on the Pieper farm, he made an examination which he believed showed the gravel was good in quality and would meet state specifications. Based on his examination, he offered to pay 9 cents a cubic yard for the gravel that he might pump. He testified that 65

percent of the gravel pumped would be useful for road purposes; and that he had tried without success to obtain gravel elsewhere. The good faith of Kimball to buy gravel from Pieper is not challenged. Kimball had a plant that would pump 500 yards of gravel a day, and he was in a position to move onto the property and start the process of pumping.

What this evidence does is to point out that this land taken by the city contained gravel of such character, quality, and quantity that it is adaptable for commercial development. Pieper and Bitner, in their testimony, considered the presence of gravel on the land in arriving at the fair and reasonable market value of the land at the time of the taking.

The city cites the case of O'Neill v. State, 174 Neb. 540, 118 N. W. 2d 616, which states: "In a condemnation action witnesses should not be allowed to give their opinions as to the value of property for a particular purpose, but should state its market value in view of any purpose to which it is adapted." We are in accord with this statement of the law, but the evidence fails to show that any witness testified as to the value of the Pieper land for any particular purpose.

The city states that the offers made by Nietfeld and Kimball in July and December are inadmissible because such evidence constituted an attempt to show a market for gravel that did not exist at the time the land was taken, citing Lane v. Burt County Rural Public Power Dist., 163 Neb. 1, 77 N. W. 2d 773, wherein this court said: "In Platte Valley Public Power & Irr. Dist. v. Armstrong, 159 Neb. 609, 68 N. W. 2d 200, cited with approval in City of Lincoln v. Marshall, 161 Neb. 680, 74 N. W. 2d 470, we held: 'The market value of lands taken by eminent domain proceedings, together with damages, if any, to other remaining lands by severance, are computable as to the time of the taking, which is deemed to occur when the petition for condemnation is filed.'"

The petition for condemnation herein was filed March

20, 1962. We conclude that while the damages are computable as to the time of the filing of the petition in the county court, the evidence relating to the gravel deposits as heretofore set out is admissible under the authorities heretofore cited. This gravel was there prior to and at the time of the filing of the petition by the city for condemnation.

The city predicates error on the fact that the trial court failed to instruct the jury as to the date of the appropriation of the land by the city, being on March 20, 1962. The court specifically instructed the jury with reference to this matter. The contention of the city is without merit.

The city also predicates error on the proposition that due to Pieper's health he was unable to continue farming and therefore leased his land out. There is no merit to this contention.

With reference to anticipated profits as contended for by the city as constituting error within the meaning of James Poultry Co. v. City of Nebraska City, 135 Neb. 787, 284 N. W. 273, modified in 136 Neb. 456, 286 N. W. 337, it is well settled that when land occupied for business purposes is taken by eminent domain, anticipated profits from the continued carrying on of a business in its established location cannot be considered in estimating the damages.

There was no attempt on the part of Piepers to show by evidence anticipated profits. The evidence was to the effect that the land contained gravel of such character, quality, quantity, and location that it was adaptable to commercial development. Approximately 57 acres of the Pieper land contained gravel deposits 25 to 35 feet in depth. It is obvious that if anticipated profits had been asked for by the Piepers the value of the gravel based thereon would far exceed what the evidence shows with reference to the reasonable market value of the land taken. According to Pieper's testimony, he took into consideration the gravel, the grass,

the pasture, apparently the hunting privileges, and all other uses for which the land was adaptable, and gave his opinion that the land was worth $61,000. Bitner testified, using the figure of 57.79 acres, on the same basis. This evidence is previously mentioned. The jury, while not instructed to make any specification in the verdict, did specify that $39,970 of the total verdict rendered represented the fair and reasonable market value of the land taken, which is $5,728.50 less than Bitner thought it was worth and $1,000 less than Morrison thought it was worth. Morrison did not consider the presence of gravel on the land taken.

As above pointed out, anticipatory profits are not here involved.

The amount of damages sustained by a landowner for the taking of land by eminent domain for a public improvement, and the difference in the fair and reasonable market value of the remainder of the land before and after the taking, is peculiarly of a local nature to be determined by a jury, and its verdict will not be interfered with if it is based on the testimony. See, State v. Wixson, 175 Neb. 431, 122 N. W. 2d 72; Myers v. Platte Valley Public Power & Irr. Dist., 159 Neb. 493, 67 N. W. 2d 739; State v. Dillon, 175 Neb. 444, 122 N. W. 2d 223.

With reference to the severance, the true test is the effect of the severance on market value at the time of the taking. This, in turn, is based upon all of the inconveniences caused by the severance as they might affect a prospective purchaser and the effect of the severance upon every available, reasonable, and probable future use of the property, as they relate to the market value of the remainder of the property considered as a unitary whole. See State v. Dillon, 175 Neb. 444; 122 N. W. 2d 223.

"In a condemnation action the weight and credibility of testimony of either lay or expert witnesses regarding value of land taken or value of remainder immedi-

ately before and immediately after taking is for the jury." Connor v. State, 175 Neb. 140, 120 N. W. 2d 916.

The above assignments of error asserted by the city cannot be sustained.

The city predicates error in that the trial court admitted on direct examination the testimony of Stricker, the lessee, over objections of the city, with reference to the value of the crops that he could have raised and the cattle he could have grazed on the land taken in the future, and the profits he could have realized therefrom. We have heretofore set forth Stricker's testimony in this respect.

The contention of the city is that by the cases of James Poultry Co. v. City of Nebraska City, *supra,* and Ballantyne Co. v. City of Omaha, 173 Neb. 229, 113 N. W. 2d 486, the rule announced therein prohibits showing anticipated loss of future profits, therefore Stricker's testimony was erroneously allowed.

The record shows that the Piepers, as of March 1, 1962, and for prior years, had an oral lease covering all of the land involved in this proceeding whereby they leased the land to Stricker. The term of the lease was from March 1 of one year to March 1 of the succeeding year, and it provided that the Piepers were to receive one-fourth of the beets, one-half of the beet tops, one-fourth of the beans, one-fourth of the potatoes, one-third of the corn, one-third of the grain, and one-half of the hay. Stricker paid the Piepers $400 annually for pasture rent, with the understanding that he was to put his own cattle in the pasture and feed them out on the place. The Piepers were to furnish one-half of all the commercial fertilizer and reserve for themselves one house, some of the buildings, and hunting rights.

Wright's testimony was to the effect that the rental value of the Pieper farm for a period of 1 year would be $6,005.30. Morrison testified that the tenant would have received a chance of netting $5,775 on the land taken.

In State v. Dillon, 175 Neb. 350, 121 N. W. 2d 798, the court had before it an oral 1-year lease on a portion, if not all, of the land at the time of condemnation. The damage to the leasehold was appraised at $1,740. It was denied that that was the true value, and alleged that such damage was $4,000. A jury was waived, and the trial court fixed the damage to the leasehold at $414, and $40.44 interest. The judgment of the trial court was reversed and the cause remanded for new trial. This court held: "In a case where land condemned is under lease to and in possession of a third person, and by the taking or damaging the lessee is deprived of his use in whole or in part, he is entitled to recover from the condemner on the same character and quality of proof as would entitle the condemnee to recover. * * * In a case where a lessee of the owner of land which has been condemned has established a right of recovery for damage to growing crops or for *deprivation of right to produce such crops,* the measure of his right of recovery is the difference between the value of his share of the crops at maturity and what would have been the cost of production of the entire crop." (Emphasis supplied.) The court went on to say: "If, as is true in this case, land condemned is farm land and is under lease and in possession of the lessee on a share crop basis the tenant is entitled to recover damages for the loss of profits brought about by the condemnation."

The evidence in behalf of the lessee in the cited case disclosed that 25 acres of the area taken which was suitable for production of corn would have produced 70 bushels of corn an acre of the value of $1 a bushel. The witness then was permitted to disclose his expenses relating to the production and the net he would receive per acre. The court then pointed out that there was no difficulty with the question of liability but only with admissibility of evidence and the measure of the right of recovery, and that the cases were in conflict on this point, and set forth many of such cases and distinguished

them. The court said that where such damage may, on the basis of evidence, be reasonably arrived at at the time of trial the damage is the value of the crops if they had been allowed to mature less the reasonable cost of total production. The court further said: "There is another cogent and compelling reason why this should be regarded as the proper attitude to be taken toward the question of proof of damages. Any other rule would have the effect of recognizing an unequivocal right guaranteed to the lessee by the Constitution of the State of Nebraska to damages but would deny any right to recover by reason of a prohibition of evidence necessary to sustain a recovery. The reference here is to the clear terms of Article I, section 21, of the Constitution. * * * The only considerations left in this area were the questions of credibility of witnesses, weight to be given to testimony, and a computation of results, which were questions of fact for the court in view of the fact that a jury had been waived."

In the light of the above-cited case, the evidence relating to the rental value of the Pieper land and the purposes for which it was used was admissible. The evidence discloses that most of Stricker's living was made from the use of the south part of the Pieper farm which was taken by the city. The severance of the farm into two parts would leave this lessee in a position where it could be difficult for him to make a living in the future under the terms of the lease heretofore mentioned. The evidence points to the fact that the grazing of cattle on the land taken was an important part of the lessee's livelihood.

The city predicates error on the part of Piepers' counsel in his argument to the jury.

The record discloses that the argument of Piepers' counsel was preserved by the reporter in the bill of exceptions. There was no motion for mistrial made either before submission of the case to the jury or after.

In Lemmon v. State, 173 Neb. 387, 113 N. W. 2d 525, it

is pointed out that as soon as the jury retired the defendant's counsel moved for a mistrial because of alleged improper remarks of counsel in his argument to the jury. This motion was overruled by the trial court. This court said: "An objection made to the argument of opposing counsel after the jury has retired is not timely and will not be reviewed on appeal. 88 C. J. S., Trial, § 196d, p. 387; Eilola v. Oliver Iron Mining Co., 201 Minn. 77, 275 N. W. 408. This court, in Sandomierski v. Fixemer, 163 Neb. 716, 81 N. W. 2d 142, sustained such objections there found to be directed towards improper statements by counsel in his argument. In the cited case, however, they were made before the cause was submitted to the jury. The court there stated that one may not complain of the misconduct of counsel if with knowledge of such misconduct he does not ask for a mistrial, but consents to take the chances of a favorable verdict. On reading the cited case it is clear that this court also considered it necessary that such a motion be made before the cause is submitted to the jury. * * * it is necessary that an opportunity be given the court and counsel to correct the misconduct if possible. No such opportunity is given them if the motion is delayed until the jury has entered into its deliberations. Neither is the defendant in such cases permitted to gamble on a favorable verdict and at the same time reserve such an objection to be urged on appeal should the jury decide against him. The motion came too late and if it was merited, which we do not decide, it cannot be considered by this court."

The objection made by counsel in the instant case, and the admonition given by the trial court to be guided by the evidence only, with no motion on the part of counsel for the city, disposes of this assignment of error under the authority above cited.

The city predicates error on the ground that the verdict of the jury is clearly excessive, is against the weight and reasonableness of the evidence, and appears to have

been given under the influence of passion and prejudice. In the determination of this question certain legal pronouncements have been made which must be regarded as controlling.

In Langdon v. Loup River Public Power Dist., *supra,* it was said: "When the evidence is conflicting the verdict of the jury will not be set aside, unless it is shown to be clearly wrong." See, also, Biggs v. Gottsch, 173 Neb. 15, 112 N. W. 2d 396.

In Smith v. Platte Valley Public Power & Irr. Dist., 151 Neb. 49, 36 N. W. 2d 478, it was said: "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." See, also, Wischmann v. Raikes, 168 Neb. 728, 97 N. W. 2d 551; O'Neill v. State, *supra.*

In the light of the evidence and the above decisions, the assignment of error by the city cannot be sustained.

Other assignments of error raised by the city are without merit and need not be determined.

For the reasons given in this opinion the judgment of the trial court is affirmed.

This brings us to the following.

The plaintiffs filed a motion requesting this court to award them a reasonable sum for the fees of their attorneys for services rendered in the district court and for fees necessarily incurred for two expert witnesses, as provided by Legislative Bill 553 adopted by the Legislature at its seventy-third session. This motion is dated September 19, 1963.

In support of this motion is attached an affidavit concerning the extent and value of such services. The affidavit is made by Rush C. Clarke and refers to the services rendered by a firm in which the affiant was formerly associated and a firm in Scottsbluff, one of the members of which helped in the trial of the case, also the time

spent in preparation for trial; that the actual trial occupied 5 days; that he and his cocounsel spent 35½ days in preliminary work and preparation for trial and 10 days in trial work, without reference to work done by other members of the firm with which the affiant was associated; that expenses incurred totaled $487.34; that for the services rendered to the plaintiffs they were charged $5,025 plus the above-mentioned expenses, which was paid in full by them; that in addition, the affiant performed services for the plaintiffs in connection with the motion for new trial and preparation therefor of the reasonable value of $450, and incurred expenses in the amount of $57.90, all of which have been paid in full by the plaintiffs; that in addition to the attorneys' fees and expenses paid, the plaintiffs incurred and paid fees in the sum of $500 to William S. Bitner and $300 to James Wright for their services as expert witnesses, which they paid; that in the Supreme Court the affiant and his cocounsel, in the trial of the case, made preparation to present the case before this court on appeal; that this work consisted of checking the bill of exceptions, studying the brief of the city on appeal, ordering a supplemental transcript, preparing a brief for the plaintiffs on appeal, studying the reply brief, and preparation for oral argument before this court; and that the reasonable value of the services of affiant and his cocounsel in this court is the sum of $3,500, and it will be necessary to incur expenses in the amount of $150 to $250. This affidavit was sworn to on September 19, 1963.

The same affiant filed a supplemental affidavit asserting that in addition to the fees and expenses paid by the plaintiffs set out in the former affidavit, the plaintiffs paid out $615 for the taking and enlarging of aerial photographs which were received in evidence; that these photographs were essential; and that the total expenses incurred by the plaintiffs including the photographs amounted to $1,102.34.

Counsel for the city filed an affidavit in opposition to

the motion above stated, in which it was denied that all the legal services alleged in the affidavit of Rush C. Clarke were rendered or, if rendered, were reasonably necessary; denied that the legal services actually rendered were of the reasonable value alleged in such affidavit; denied that attorneys' expenses in the amounts alleged in such affidavit were incurred or, if incurred, were reasonably necessary and were reasonable in amount; and denied that the fees to two expert witnesses, as alleged in such affidavit, were reasonable in amount. This affidavit was signed on October 16, 1963.

Counsel for the city filed a supplemental affidavit wherein he asserts that he is one of the attorneys for the city; that he has been a member of the Nebraska State Bar Association since 1937; that the reasonable value of the services rendered by plaintiffs' attorneys, and reasonably necessary to be rendered by them, in the district court did not exceed $2,500, and in this court not to exceed $1,000; and denied that the expenses for aerial photographs mentioned in the supplemental affidavit of Rush C. Clarke were necessary and reasonable in amount.

Laws 1963, chapter 432, page 1448, Legislative Bill 553, insofar as necessary to consider here, provides in part: "Sec. 2. That section 76-720, Reissue Revised Statutes of Nebraska, 1943, be amended to read as follows:

"76-720. If an appeal is taken from the award of the appraisers by the condemnee and the amount of the final judgment is greater by fifteen per cent than the amount of the award, or if appeal is taken by the condemner and the amount of the final judgment is not less than eighty-five per cent of the award, or if appeal is taken by both parties and the final judgment is greater in any amount than the award, the court may in its discretion award to the condemnee a reasonable sum for the fees of his attorney and for fees necessarily incurred for not more than two expert witnesses. On any appeal by the condemner, the condemner shall pay

all court costs on appeal. If appeal is taken by the condemnee only, he shall be charged with such costs if the final judgment is not greater than the award of the appraisers.

"Sec. 3. The provisions of section 76-720 shall apply to any case now or hereafter pending on appeal from the award of the appraisers as provided in section 76-710.

"Sec. 4. That original section 76-720, Reissue Revised Statutes of Nebraska, 1943, and section 76-710.01, Revised Statutes Supplement, 1961, are repealed.

"Sec. 5. Since an emergency exists, this act shall be in full force and take effect, from and after its passage and approval, according to law.

"Approved July 14, 1963."

It is the contention of the city that the relevant provisions (section 2) of Legislative Bill 553, of the seventy-third session of the Legislature, do not apply to this proceeding; that on the effective date of the act (July 14, 1963), this proceeding was already pending on appeal from the district court to this court, not on appeal from the award of the appraisers as provided by section 76-710, R. R. S. 1943; that the city's brief to this court had been filed and served on June 28, 1963; that to apply the act to this case would deprive the city of an opportunity, provided by the act, for the city to determine, while the case still was pending on appeal from the award of the appraisers to the district court, whether it would pay the award rather than risk incurring liability for fees for condemnees' attorneys and expert witnesses; that the act vests in the district court, not in this court, original jurisdiction to determine the question of attorneys' and expert witnesses' fees for services in the district court; that there are issues of fact as to fees in both the district court and this court that cannot be tried in this court on affidavits; that the award of such fees is, in any case, not mandatory, but discretionary; that in the exercise of sound discretion, this court should deny

an award for fees for any services rendered before the act became effective, as liability therefor could not have been anticipated by the city; that the act makes no provision for an award in any case until final judgment has been rendered; that even if the judgment of the district court were to be affirmed, the award of fees, if any, should take into account the fact that, on the record, the city had reasonable cause to expect that the jury's verdict would have been substantially less than it was, and then that the judgment of the district court would be reversed on appeal; and that the act makes no provision for an award of attorneys' expenses, and the request should be denied.

The award of the appraisers in the case of the plaintiffs was $50,470, and as to the lessee Stricker was $5,775. The verdict of the jury totaled $64,170 for the plaintiffs and $5,775 for Stricker. Thus the verdict of the jury was not only not less than 85 percent of the awards, but in the case of the plaintiffs was greater than the amount of the award by more than 15 percent. Therefore, it is the contention of the plaintiffs that the city, not being satisfied with the award made by the appraisers, chose to perfect an appeal to the district court, imposing a burden of expenses on the plaintiffs; and that it is unjust for the city to gamble on a smaller award at the expense of the plaintiffs.

The city contends that the act applies only to an appeal from the award of the appraisers made in the county court to the district court, and does not apply where an appeal is taken from the district court to this court.

The word "pending" means: "Begun, but not yet completed; unsettled; undetermined; in process of settlement or adjustment. Thus, an action or suit is 'pending' from its inception until the rendition of final judgment." Black's Law Dictionary (3d ed.), p. 1345. See, also, Wentworth v. Town of Farmington, 48 N. H. 207; Mauney v. Pemberton, 75 N. C. 219; Ex parte Munford,

57 Mo. 603; Cain v. French, 29 Cal. App. 725, 156 P. 518. Therefore, the act applies when an appeal is taken from the district court to this court.

We conclude that no fee or other expenses should be allowed in this court prior to the date the act became effective. This case was tried in the district court in January 1963, and the appeal to this court was made in March 1963. We conclude that an attorneys' fee of $1,000 for services rendered by the plaintiffs' attorneys in this court should be allowed. All other requests set forth in the motion by the plaintiffs should be denied.

AFFIRMED.