JAMES ISKE, APPELLEE, v. OMAHA PUBLIC POWER DISTRICT, A PUBLIC CORPORATION, APPELLANT.

178 N. W. 2d 633

Filed July 10, 1970. No. 37371.

Fraser, Stryker, Marshall & Veach, for appellant.

Dixon G. Adams, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is a condemnation action in which the Omaha Public Power District, hereinafter referred to as condemner, condemned a transmission line easement across the plaintiff's property in Sarpy County, Nebraska. The board of appraisers awarded damages in the amount of $94,870. On appeal to the district court the jury made an award of $135,000 and the trial court allowed attorneys' fees of $13,500 and expert witnesses' fees of $1,500. Defendant perfected an appeal to this court.

The easement condemned is a permanent one for a 345,000 kv transmission line or lines. The easement varied in width from 300 feet on the north boundary of the property to 400 feet on the south, and covers 38.3 acres. The taking completely severed a tract containing 3.15 acres on the south end of the property. The easement area is zoned Industrial 2. The witnesses agree the taking was sufficiently broad that no part of the easement area could ever be used for mineral production; that no structure could ever be placed on the easement; and that if a mining operation were conducted adjacent

to the easement it would be necessary to leave protective slopes to protect the easement.

The area condemned is a part of a tract of 340 or more contiguous acres, separated by an east-west county road and bounded on the south by the Platte River. The land south of the east-west county road slopes gently to the river. The land north of the county road gradually rises and as it goes north is wooded and hilly. A graveled county road, which is a projection of Thirty-sixth Street in Omaha, separates the land north of the east-west county road. The county road connects with U. S. Highway No. 73-75 some distance east of the plaintiff's property. The land directly west of the easement area is owned by the Metropolitan Utilities District of Omaha. A large water treatment plant and a well field are located on the Metropolitan Utilities District's tract. Cedar Island, which was the island involved in Iske v. Metropolitan Utilities Dist., 183 Neb. 34, 157 N. W. 2d 887, lies south and west of plaintiff's land. Immediately west of plaintiff's land to the north of the county road there are two operating limestone quarries.

The property north of the county road contains outcropping of limestone, but to the date of the taking had been farmed. The property south of the road to the river is level bottomland, sloping to the river, and was planted in corn at the time of the taking, August 8, 1967.

The easement condemned occupies a strip along the west edge of the plaintiff's land from its north boundary to its south boundary. It crosses the westerly end of a lake extending across the south end of plaintiff's property, which lake lies adjacent to the Platte River. This lake was formed by a 1960 to 1963 gravel pumping operation. Immediately to the east of this lake, on adjoining properties, there are a series of other lakes created by gravel pumping operations which have now been substantially developed as recreational sites.

Plaintiff's evidence indicates that the land north of the county road is suitable and adaptable for a lime-

stone quarrying operation, and the portion south of the county road is adaptable for the production of sand and gravel, with a residual use for recreational cabin sites.

Plaintiff's first expert witness was a geologist employed to make a subsurface investigation. He drilled two holes to study the limestone formation and used core drillings made by others to evaluate the extent of the mineral deposit on the property, including the easement area. He had previously participated in the testing of the land immediately to the west of plaintiff's land and south of the county road. In addition to the drillings he made a visual inspection of the limestone formation being quarried on the adjoining property. He testified that he had sufficient information to make a reasonable projection of the material under plaintiff's land. He testified to the presence of 1,361,111 cubic yards of limestone; 22,000 cubic yards of wall rock; 1,426,660 cubic yards of natural sand and gravel; and 727,905 cubic yards of fine aggregate underlying the easement area and the protective slope.

Plaintiff then produced an owner of a gravel operation who testified that the amount of material underlying plaintiff's property would make it economical to set up a gravel pumping operation. Plaintiff produced witnesses who testified as to the market for wall rock as well as sand and gravel. Plaintiff also produced a number of witnesses as to the recreational potential which existed in the immediate area of the sand and gravel land. One of them had developed such an area directly across the river from plaintiff's land. This witness testified to the demand for recreational lots in the area and stated that plaintiff's land was more favorably situated than his own and could definitely be developed as a recreational area.

Plaintiff produced a civil engineer and land developer who submitted a proposed design as an illustration of one of the possible ways the plaintiff's land could be

developed. He also submitted cost estimates on the proposed development.

Plaintiff's three value experts were licensed real estate brokers who had experience in the appraisal of mineral properties. Their values ranged from $182,600 to $225,000. They all testified to considering the market data or comparable sales approach, but because they could find no comparable sales were forced to use the capitalization of income approach. Both of condemner's appraisers, who fixed plaintiff's damage at $20,115 and $24,257, used the market data approach, but because they could find no comparable sales testified they made necessary adjustments to compensate. Condemner's experts conceded that they knew of no sale of any land that had rock, sand and gravel, and a resort potential all on the same piece of property.

Compensation for land taken by right of eminent domain is measured by its full market value as of the date of the appropriation, and anything connected with the land that would influence its market value in the mind of a good faith intending purchaser is an element for consideration in awarding damages. Lechliter v. State, *ante* p. 527, 176 N. W. 2d 917.

In determining the market value of land condemned, its special adaptability or availability for the highest and best use may be shown and considered. The evidence, while disputed, is fairly conclusive that the highest and best use of the property condemned herein was as part of a limestone and wall rock quarrying operation on the north, and a sand and gravel operation on the south, with a resultant lakeshore recreational facility. This necessarily was one of the fact issues determined by the verdict of the jury. As this adaptability would increase the value in the eyes of prospective purchasers, the plaintiff is entitled to have that fact considered in determining the market value of the land condemned.

Where stone or mineral deposits may have bearing on the market value of the land, evidence as to the ex-

tent of those deposits is admissible but the award may not be reached by separately evaluating the land and the deposits. See, Burlington & M. R. Co. v. White, 28 Neb. 166, 44 N. W. 95; Pieper v. City of Scottsbluff, 176 Neb. 561, 126 N. W. 2d 865. Consideration is given to the quantity and quality of the minerals that can be extracted and to the value thereof solely as evidence for arriving at the value of the land.

The element of speculation in mineral deposits underlying the land condemned does not preclude their consideration in ascertaining the market value of the land. At best, evidence of value with land such as this is largely a matter of opinion. Certainly, condemner should not be permitted to profit from the possible uncertainty of actual market value when it deprives the condemnee of his property. The quality and quantity of the rock which may be quarried, or sand and gravel which may be profitably removed from land being condemned, are admissible to show that they are sufficient for and adaptable to commercial development. If so, they will have an effect on the market value of the lands. However, the market value of the property is the value of the land with the materials in place and not the value of the materials if they were removed. The evidence in this case indicates that plaintiff's expert witnesses did not value the rock, sand, and gravel in place as items separate from the value of the land, but used that information as a factor in arriving at the value of the land.

Condemner devotes 47 pages of its brief to the sufficiency of the evidence to sustain the verdict and attacking the rulings of the trial court on numerous objections to the admission of evidence. Condemner's objections are answered in Iske v. Metropolitan Utilities Dist., 183 Neb. 34, 157 N. W. 2d 887. Condemner, cognizant of that possibility, attempts to distinguish the facts of that case from the instant one because that case involved the presence of Cedar Island, and the taking was a fee simple title, whereas in the instant case an ease-

ment is taken, admittedly, however, with broad rights which would definitely preclude use except for farming. For practical purposes any industrial or recreational use is destroyed. Plaintiff's land is contiguous to recreational developments and between those developments and Cedar Island. That a recreational potential existed and was a present consideration is apparent from the evidence of those interested in the adjoining developments and from the aerial maps of the area. This reasonably prospective recreational development is a factor to be considered in determining market value.

The resolution of the question as to the presence of minerals and potential recreational development is primarily for the jury under the conflicting issues raised, and the evidence should be decided like any other question of fact at issue in a case. As we said in Iske v. Metropolitan Utilities Dist., 183 Neb. 34, 157 N. W. 2d 887: "It is not for the court to determine under the guise of a determination of the admissibility of evidence."

Condemner vigorously assails the foundation for and the testimony of plaintiff's value witnesses. It specifically attacks the reliability of the evidence of plaintiff's geologist in view of evidence produced by it. It further maintains that the rocks underlying the northerly portion of plaintiff's farm are no different in quality or quantity than those which underlie the whole area in adjoining counties. Also, it produced a former manager of the sand and gravel company which had operated on a part of the premises, who testified that further sand and gravel operations on the premises would be economically unfeasible. Condemner argues from this evidence that the land had no value above the market value of comparable farm land. Condemner's experts based their opinions on that premise, but did consider the taking to be the equivalent of a total one.

Plaintiff's value witnesses were shown to be experienced appraisers who had experience with mineral lands as well as some familiarity with the subject prop-

erty. They were furnished with the results of the studies made by plaintiff's other experts. Additionally, they studied the market for minerals, the cost of transportation, the accessibility of a ready market, other sources of supply, and the reasonable potential of a resultant recreational development.

In Iske v. Metropolitan Utilities Dist., 183 Neb. 34, 157 N. W. 2d 887, we held: "Generally, an expert witness, otherwise properly qualified, may be permitted to use and to testify concerning the different factors affecting valuation which a well-informed buyer would use in arriving at the price which he would pay for the property at the time of the taking.

"Generally, an expert witness, when properly qualified, may testify as to the valuation of the property, and the weight and credibility of what the witness considers in coming to his conclusion is for the jury to determine."

In Jensen v. State, 184 Neb. 802, 172 N. W. 2d 607, we said: "Expert opinion evidence in a condemnation case, as in all other cases, is to be considered and weighed by the triers of fact like any other testimony. It is only advisory in nature and is not binding upon the jury or the court. The weight and credibility of the testimony of either lay or expert witnesses is for the jury. The amount of damages sustained in an eminent domain action is peculiarly of a local nature and ordinarily is to be determined by the jury, and this court will not ordinarily interfere with the verdict if it is based upon admissible testimony."

Plaintiff's three value appraisers rejected the market data appraisal approach used by condemner's witnesses, because they could find no comparable sales. The method used by them was the capitalization of income approach. This appraisal method was specifically approved in Iske v. Metropolitan Utilities Dist., *supra*, and on the plaintiff's evidence was appropriate herein.

Condemner complains that the verdict herein is ex-

cessive. What we said on this point in Iske v. Metropolitan Utilities Dist., *supra*, is pertinent: "The jury verdict fell in between the two sets of conflicting expert testimony, being $510,150. The above situation is a frequent one in condemnation cases. Our court has often discussed the function of the jury in this kind of a situation. As we have pointed out, there was no error in the trial that could be asserted as properly related to an error in the amount of the verdict. The weight and the credibility of the testimony of either lay or expert witnesses is for the jury. Expert opinion evidence, widely varying in this case, is to be considered and weighed by the triers of fact like any other testimony. The expert witnesses' testimony is purely advisory and is not binding on the triers of fact. The amount of damages sustained is peculiarly of a local nature and ordinarily is to be determined by the jury and this court will not ordinarily interfere with the verdict if it was based upon admissible testimony. When the evidence is conflicting the verdict of the jury will not be set aside unless it is clearly wrong. A landowner only has one day in court and he must recover all of his damages in this condemnation proceeding."

The jury had an opportunity to view the property. This factor is of some significance in the determination of the excessiveness of a verdict in an eminent domain case. See Iske v. Metropolitan Utilities Dist., *supra*. It is also to be noted that the board of appraisers in county court allowed almost four times the amount fixed by condemner's value witnesses. Obviously the jury did not accept the conclusions of condemner's value witnesses nor the premise that the highest and best use of the property was for agricultural purposes and that it had no quarrying and recreational potential. While the award is generous, it is well within the range of the valuation evidence. On the record herein we cannot say that the verdict is excessive or the result of passion, prejudice, or mistake.

Condemner argues several other alleged errors. We have examined the assignments made and find none which prejudicially affected the verdict herein.

The judgment of the district court is affirmed. No allowance is made in this court for attorneys' fees.

AFFIRMED.

NEWTON, J., dissenting.

I find I must respectfully dissent from the opinion of Spencer, J. In doing so, I adhere to my dissent in Iske v. Metropolitan Utilities Dist., 183 Neb. 34, 157 N. W. 2d 887, and refer to it as a reference regarding certain legal propositions which I will not here reiterate. The evidence in this case does not sustain the verdict. The Iske land adjoins the Platte River on the north. The southerly portion consists of uncleared timber and accretion lands and a lake left after completion of gravel mining operations. The portion of primary interest lies to the north of this area. It consists of a 60-acre tract on the extreme north which is high or hill ground and to the south of approximately 160 acres of gently sloping bottom ground. The 300-foot easement runs along the extreme west boundary and consists of approximately 38 acres. The area alleged to be suitable for rock mining is in the hills and that alleged to be suitable for gravel removal operations, in the bottom ground.

The undisputed evidence shows that the gravel vein is overlaid with clay to a depth of 6 to 25 feet. The overburden becomes progressively deeper as one progresses to the north from the present lake. Under the clay are several feet of mixed dirt and sand, then several feet of fine sand is encountered, all above the gravel vein, and all unmerchantable. The clay must be stripped off by means of such machinery as bulldozers, turn-a-puls, and drag lines. In all of the bottom land area the clay runs to a depth at least 2 to 3 feet below the water level, a factor which tends to interfere somewhat with stripping operations.

Plaintiff concedes that the clay overburden reaches

a depth of 13 feet at a point approximately one-third of the way north on the bottom ground from the present lake and that beyond that point it would be economically unfeasible to maintain a gravel mining operation. Testimony as to the amount of available sand and gravel is limited to this southerly area. Plaintiff has completely failed to produce any evidence regarding cost of removal of the overburden. The record is likewise barren of *any* evidence tending to prove the economic feasibility of gravel mining operations on the southerly one-third of the bottom ground. On the other hand, defendant produced a witness who, though now retired, was for many years manager and employee of the Lyman-Richey Sand and Gravel Corporation which excavated the present lake on the Iske property while pumping out the gravel on that site. He was in charge of that operation and thoroughly investigated the area adjoining the lake on the north to ascertain the feasibility of extending gravel mining operations into that area. He testified unequivocally that it was not economically feasible to do this primarily because of the heavy overburden and also because clay strata were encountered in the gravel bed. Notwithstanding this situation, evidence was received as to the amount of gravel underlying the land and its royalty value. The entire case, including the verdict, is based on an unproved assumption that the gravel was so situated that mining operations would return a normal profit.

The same situation is found with the rock mining proposition. This area has a 25-foot overburden and there is no evidence to verify the economic feasibility of a mining operation. Plaintiff's only witness along this line said he did not know if it was economically feasible as his only experience was with rock having a 4- to 6-foot overburden. It was also established that this type of limestone rock was very widespread throughout Douglas and Sarpy Counties and the surrounding area.

The proposed lake area which plaintiff alleges could

be improved for recreation purposes covers the entire bottom land area notwithstanding that plaintiff concedes only the south one-third could be economically excavated in a gravel mining operation. Reception of this evidence is patently erroneous. A mere showing of the physical presence of minerals is not sufficient to show that the property was available for use as a source of supply of the minerals. A year before, one of plaintiff's witnesses testified that this same rock land was worth no more than farmland. He based that testimony on a market data approach. This time he used an income capitalization approach and materially altered his testimony.

Plaintiff's expert real estate appraisers testified there had been no other sales of somewhat similar property in the general area and that consequently they could not use the market data approach in determining value, yet a witness for defendant testified there were a very considerable number of such sales.

It is an accepted practice to permit the introduction of evidence relating to quantity of minerals present on the property and the royalty value per cubic yard. It must, however, be borne in mind that the end sought is the actual value of the land with the minerals in place thereon. It is ridiculous to assume that a purchaser would pay the full amount arrived at by multiplying the number of cubic yards of gravel present by the expected royalty rate. The purchaser would be interested only because he hoped to make a profit on his investment, a profit that could not be realized if he paid all that the royalty income would return to him. Such a purchaser would buy only if he could do so on a basis that would preserve for him all or a major portion of the royalty income. It is then evident that the royalty income has very little relationship to actual or market value. Compensation for land taken is measured by the market value at the time taken. See Leffelman v. City of Hartington, 173 Neb. 259, 113 N. W. 2d 107. The income

capitalization method of arriving at value is reasonably accurate where a building is involved. It is a simple matter to determine net rentals and an assured annual rate of income from such rentals over a period of many years. In cases dealing with minerals, the material is sold and disposed of and the mine is constantly subject to a process of depletion. A steady, long-term return on the investment at a readily determined rate is not forthcoming.

The uncertainty of this type of evidence is referred to in 5 Nichols on Eminent Domain (3d Ed.), § 19.3 (3), p. 19-63, wherein it is stated: "Estimation of the amount of material to be mined and testimony of a fixed price per unit, the product of which is to be used as the measure of the income to be derived from the mining or quarrying operation has invariably been rejected in the determination of the market value of the land. Such evidence requires a degree of refinement in the measure of values which seems totally incompatible with the gross estimates involved in ordinary transactions. Though there may be the most accurate calculation of the quantity of material to be mined, yet, without knowing exactly the expense of bringing it to the surface and carrying it to market, and the amount likely to be lost in mining and conveying, and the times in which it would be brought out, and the market prices at those times, the quantity is of no aid in valuing the land. The gross estimates of ordinary business transactions are all that courts and juries have skill enough to use as a measure of value. All other measures are necessarily arbitrary and fanciful."

The distinction between showing the existence of minerals on the land and admitting expert evidence based on the multiplication of cubic yards by royalties is pointed up in State Highway Commission v. Arnold, 218 Ore. 43, 341 P. 2d 1089. It is there stated: "On the other hand Barnes definitely used the multiplication method in his estimate, and as far as we can discern

from the transcript it was the sole method used by him. Whether or not it was the sole method we are of the opinion that its use in this case is ground for reversal. The evil of the method is not simply the danger of leading the appraiser to an inaccurate appraisal but more important, because it has the illusion of scientific certainty and validity, it is too likely to be grasped upon by the jury as the sole criterion of value even though the expert witnesses in making their estimates purport to eliminate from their computation the element of speculation. * * * 'Both (appraisers) appraised the land upon the basis of returns inuring to the defendants out of future sales of the rock material. Both made inquiries and investigations with respect to the production, transportation and sale of rock material. Predicated thereon, they estimated the selling price in the future of the rock material and then made deductions by way of expenses for blasting, trucking, general operating expenses, allowance for risks and other unforeseen business contingencies and then, upon that concept, proffered their opinions as to the market value of the property. *What they really did was to appraise the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself as of the date of the taking.* Such a modus of evaluation is not according to proper standards or criteria legally approved in the determination of market value.' * * * 'Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the

conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value. True it is that quality and quantity have a place in the mind of the buyer and the seller, but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent. Values fixed by witnesses on such a basis are practically worthless, and should not be accepted. *To the extent the valuation fixed by any witness contains this speculative element, to the same extent is its value as evidence reduced.'*"

In 5 Nichols on Eminent Domain (3d Ed.), § 18.41 (3), p. 18-154, it is stated: "An expert may be competent for one purpose and not for another. An ordinary real estate agent is not qualified, as such, to testify with respect to construction costs or with respect to the value of a type of property that has no market value by reason of the fact that such type is not commonly bought and sold. Thus, one who is an expert in valuing property for insurance purposes is not necessarily competent to testify in a condemnation proceeding. * * * In the absence of market value, resort may be had to the testimony of more specialized experts. Thus a witness who is an expert on timber may express his views on the value of timber land, and one who has an intimate knowledge of the availability of waterfront property or of property with peculiar subterranean water resources may

testify as to the value of such property by reason of the special use which may be made of the property. The value of property for a special use to which it is adapted or put may be shown by persons familiar with such use, even though they are not familiar with land values generally." Also, in § 18.42, p. 18-168, it is said: "When the property taken is of a character not commonly bought and sold, and differs essentially from other land in the immediate vicinity in the features which affect value, not only is testimony of witnesses familiar with its special value for the use to which it is adapted competent by reason of experience in their own business with similar property, but an expert in real estate generally who has no knowledge of the value of land of this character is incompetent, however much he may know of the prices paid for ordinary land in the immediate neighborhood."

In the present case the three real estate appraisers called by plaintiff all conceded that in using the income capitalization approach they relied primarily on the figures showing the amounts of rock, sand, and gravel estimated to be present and the estimated royalties which might be received by the owner. They also conceded that they had no other knowledge or basis for fixing a value on this type of property as in their words, there were no comparable sales in the area. The following question was asked of one of these experts: "Q. What income did you use in arriving at those figures that you capitalized, what kind of income? A. Well, I used a royalty on the quantities that were given to me."

One need not be a real estate expert to make such a computation. Probably any accountant, banker, or mathematician could do it as well or better. The basic reason for permitting experts to give opinion evidence is that they have peculiar knowledge of the subject not commonly possessed by others. Here the alleged experts were out of their depth or field. They had no special knowledge of the values of rock or gravel quar-

ries but attempted to determine value solely by means of a mathematical exercise based on other evidence in the record. The jurors were themselves capable of making such a computation were it permissible, but as has been seen, this represents an impermissible method of arriving at value. Plaintiff's experts were not qualified to testify in a case of this nature and it was prejudicial error to receive such testimony.

CARTER, J., joins in this dissent.

BOSLAUGH, J., dissenting.

I agree with Judge Newton that the evidence does not sustain the verdict in this case. I would reverse the judgment as excessive. See, Moyer v. Nebraska E. G. & T. Coop., Inc., 171 Neb. 879, 108 N. W. 2d 89; Nielsen v. Tri-State G. & T. Assn., Inc., *ante* p. 219, 174 N. W. 2d 722.

WHITE, C. J., concurring.

I am in full agreement with the majority opinion. The dissent is an able and persuasive argument on the facts that the valuation is too high. We do not sit as a jury in eminent domain cases. A search for true valuation is an elusive quest, and any "formula" is confounded by many variables, which this case demonstrates. As our cases clearly command, a jury award in eminent domain cases is peculiarly of a local nature, and will not be set aside unless it flows from passion, prejudice, or error in instructions as to the law. The dissent reveals that no such error is claimed here. All of the foundational requirements for the expert testimony, admittedly broad, have been met. The doctrine of judicial review does not permit an invasion of the jury prerogative. Judicial restraint commands that we exercise our powers within the limits that we ourselves have fixed for almost 100 years.