DONALD J. DAWSON AND MINA PFEIFLEY DAWSON, HUSBAND AND WIFE, BILL PALMER, AND BRIAN WHEELER, APPELLEES, V. PAPIO NATURAL RESOURCES DISTRICT, APPELLANT.

292 N. W. 2d 42

Filed May 13, 1980. Nos. 42564, 42641.

Paul F. Peters, for appellant.

J. Thomas Rowen of Miller & Rowen, P.C., for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C. J.

The appellant, Papio Natural Resources District, appeals from a jury verdict in favor of the landowners Donald J. Dawson and Mina Pfeifley Dawson. While the records indicate that there are two separate appeals, consolidated for hearing, the facts disclose but a single trial with two separate notices of appeal. For our purposes, we shall consider the matters together as though they constituted but one appeal.

Papio filed its petition in the county court of Sarpy County, Nebraska, on May 4, 1978, seeking to condemn certain of the land of the Dawsons located in Sarpy County. Papio alleged that, for purposes of the Missouri River Levee System Unit R-616 and for recreational purposes, it was necessary that Papio acquire certain of the Dawsons' real estate, more particularly consisting of 79.5 acres of land, together with a permanent berm easement over a 9.5-acre

tract and permanent levee easements over 12.1- and 0.3-acre tracts. The appellees Bill Palmer and Brian Wheeler were later added as parties, it appearing that they had rights as tenants. The county court appraisers awarded the Dawsons $305,210 in damages and awarded tenants Palmer and Wheeler crop damages in the amount of $15,210. Papio perfected an appeal to the District Court for Sarpy County, Nebraska.

Immediately following the empaneling of the jury, the District Court viewed the Dawson property by helicopter. Evidence was thereafter presented by both the Dawsons and Papio and, upon consideration of the evidence, the jury returned a verdict in favor of the Dawsons in the amount of $450,000. By stipulation of the parties, it was agreed that a directed verdict should be entered in favor of Papio on the issue of crop damage to the tenants.

Papio filed several motions for new trial which accounts for the two appeals, and a motion to vacate the judgment, all of which were overruled. The District Court, after taking further evidence, entered an award in favor of the Dawsons for attorney's fees and costs in the amount of $59,336.80. Papio appeals from the judgments for damages, fees, and costs. The legal propositions presented to us in the instant case are not dissimilar from those presented to us in the case of *Clearwater Corp. v. City of Lincoln,* 202 Neb. 796, 277 N.W.2d 236 (1979), involving similarly located property though involving a different governmental subdivision. For reasons more particularly set out herein and earlier discussed in the *Clearwater* case, we must, as we did in that case, reverse and remand the instant case for a new trial.

Papio assigns a number of errors. There is but one that we need consider at this time in order for us to dispose of the instant appeal. Papio maintains that the evidence presented by the Dawsons' expert witnesses was insufficient to justify consideration by

the jury. A brief summary of the evidence is necessary in order to consider that assignment of error.

The record discloses that Kenneth Amick, the owner and operator of a sand and gravel operation located near the Dawson property, had previously testified in a case involving Frank H. Prucka and Margaret Prucka and Papio. It further appears that Mr. Amick was unavailable to testify in the instant case due to a health problem and that the parties stipulated and agreed that Amick's testimony given in the Prucka case could be read into evidence in the Dawson case in the absence of Amick, subject to Papio's right to object to the evidence.

Amick's testimony basically established the manner in which a sand deposit may be developed, how the sand is removed, the method of calculating the amount of sand in a deposit, and how it is valued.

Papio objected to several parts of the testimony, maintaining that Amick's evidence should not be considered by the jury because Amick had not seen the Dawson property. While a serious question may be raised as to the weight and sufficiency of the evidence as it was presented, a matter to be considered by the jury, it is clear that the evidence, in itself, was admissible for foundational purposes and could have been considered by the Dawsons' other witnesses had they been sufficiently familiar with the facts of the matter. The introduction into evidence of Amick's testimony was not reversible error. See *Iske v. Omaha Public Power Dist.,* 185 Neb. 724, 178 N.W.2d 633 (1970). The testimony of the other two expert witnesses, however, makes it clear that Amick's testimony, while admissible, was of little importance to them.

After Amick's testimony was read, the Dawsons called as an expert witness one Joseph G. Strawn, who testified that he was the county assessor of Sarpy County from 1967 to 1971. He testified that he had conducted appraisals for various clients and had

appraised the Dawson farm as of May 5, 1978, the date of the taking. According to Strawn, based upon comparable sales, the entire 430-acre farm had a value of $1,569,500 or $3,650 per acre before the taking; the value of the 102.4 acres involved in the fee taking and easement areas was $373,760; and the remaining 327.6 acres had a "before" value of $1,195,740 and an "after" value of $801,700 giving a value for severance damages of $394,040. He estimated total damages at $767,800. An examination of the record discloses, however, that the properties considered "comparable" by Strawn, in fact, were not "comparable" and could not be considered for purposes of determining the "before" and "after" value based upon a market approach.

The witness further testified that, in part, his appraisal was based upon an "income" approach and considered the fact that sand located beneath the Dawson property could be economically removed from the land and commercially sold and the remaining property thereafter developed for recreational purposes. However, on cross-examination, Strawn stated that he had no indication of any large project in the vicinity which would require any substantial quantities of the type of material available from the Dawsons' property and his testimony revealed that he had no idea whatsoever of the demand for the material. He further conceded that, without any demand for the sale of the materials, the sand could not be economically removed and the resultant lake could not be created. All of these matters would be important, however, if Strawn were to base his opinion on the value of the sand beneath the property. He further conceded that he knew that the present zoning of most of the Dawson property was for agricultural use and the land could not be put to what, in his opinion, was its highest and best use without rezoning.

The Dawsons then called a James W. Warren who

owned a real estate and insurance office and was a licensed appraiser. When asked his opinion of the value of the Dawsons' land before the taking, using a comparable sale or market approach, the witness said he derived his values by using "factors." The witness enumerated his "factors" and then stated, "I just look at the different things and derive factors in my mind." The witness gave his opinion that the total damages from the taking were $748,175, consisting of the taking and damages to the remainder. Mr. Warren stated that the sales he used in his "factor system" indicated that, since the Dawson land was adjacent to the city of Bellevue, he had to use development in his thinking. He knew that the zoning of the property was agricultural but the zoning did not affect his opinion of the highest and best use of the property, he testified, because people were always getting property rezoned.

The witness said he considered a number of land sales, perhaps 200 to 250, but picked out a cross-section. Over objection as to foundation, the witness was allowed to testify that he used as a "factor" a 1974 sale in Papillion, Nebraska, of land for lake development at $2,083 an acre. A second sale he considered was land sold to the city of Papillion. Insufficient evidence was introduced to clearly indicate that the sale was voluntary. A third sale considered was the sale of an existing developed lake, not comparable in size. Warren conceded that the difference in size did not make the sale comparable but was used as a "factor."

A fourth sale considered by Warren was a 1977 sale by Campbell Soup Company to Advanced Development. Furthermore, the evidence disclosed that the land was already zoned for industrial use and was to be used by the purchaser for a housing development.

A fifth sale involved a 67-acre tract of land adjacent to Interstate 80.

The evidence disclosed that a number of the sales considered by Warren were not comparable either in time or in the nature of the sale or the size of the tract. It is clear that, to a large extent, Warren's testimony, like Strawn's, was based upon an assumption that the sand beneath the property could be removed and commercially sold at a profit and a resulting lake could be developed for recreational purposes. Warren, however, testified on cross-examination that he had no knowledge or information as to the demand for such material or whether there was, in fact, a market for it. He could not show the existence of any demand that would indicate that it was likely that there would be a person who would pay royalties to the Dawsons to withdraw the material. The evidence at trial disclosed that, absent a commercial market to remove the sand, the land could not be economically developed. On the other hand, the evidence disclosed that Papio produced a witness who testified that he had knowledge of the state of the market for the sand. But, upon the Dawsons' objections, the witness was prohibited from giving his opinion on the question of whether there was a market for the sand.

As we indicated earlier, the principal issue raised by Papio is whether the testimony of the Dawsons' two experts was based upon sufficient foundation to justify its being considered by the jury. We believe from what we have pointed out, that it was not. It appears to us that it fails in two respects. The testimony with regard to "comparable sales" fails to establish that, in fact, the sales were comparable. Generally, in an eminent domain proceeding, evidence as to the sale of the identical property is admissible as evidence of market value, provided there is adequate foundation to show the evidence is material and relevant. The foundation evidence should show the time of the sale, the similarity or dissimilarity of market conditions, the circumstances

surrounding the sale, and other relevant factors affecting market conditions. *Clearwater Corp. v. City of Lincoln, supra; Roush v. Nebraska P. P. Dist.,* 189 Neb. 785, 205 N.W.2d 519 (1973). The record in this case fails to disclose the existence of those relevant factors and the evidence of comparable sales is, therefore, defective. Papio's objection to the testimony by the two experts based upon comparable sales should have been sustained.

Likewise, both of the Dawsons' principal expert witnesses determined that the highest and best use of the property was for the removal of sand and the development of a recreational area. Again, the underlying factors necessary for them to reach such a conclusion are totally lacking in the record. It is fundamental that the plaintiff's burden to prove the nature and amount of damages cannot be sustained by evidence which is speculative and conjectural. *Clearwater Corp. v. City of Lincoln, supra.* While it is true that the current Nebraska Rules of Evidence, Neb. Rev. Stat. §§ 27-101 to 1103 (Reissue 1975), have substantially liberalized the requirements for an expert witness to render an opinion absent objection, the rules have not eliminated the requirement that an expert, in fact, have some basis for his opinion when called upon to disclose that basis. See § 27-705. As we said in *Clearwater* at 803-04, 277 N.W.2d at 241, discussing the change in the Rules of Evidence:

> This does not mean that an expert witness is no longer required to disclose the basis for his opinion if required to do so by the trial court or that the jury is entitled to consider the opinion of an expert witness if cross-examination discloses there is no adequate factual basis for the opinion.
>
> . . .
>
> Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him to express a

reasonably accurate conclusion as distinguished from a mere guess or conjecture. The witness should not be allowed to express an opinion on an inadequate basis or in respect to facts not disclosed to the jury. Gilbert v. Gulf Oil Corporation, 175 F. 2d 705 (4th Cir., 1949). See, also, Horton v. W. T. Grant Co., 537 F. 2d 1215 (4th Cir., 1976); Wilson v. Volkswagen of America, Inc., 561 F. 2d 494 (4th Cir., 1977); Polk v. Ford Motor Co., 529 F. 2d 259 (8th Cir., 1976); Omaha Indian Tribe, Treaty of 1854, Etc. v. Wilson, 575 F. 2d 620 (8th Cir., 1978); Tabatchnick v. G. D. Searle & Company, 67 F. R. D. 49. Where the opinion testimony of an expert witness does not have a sound and reasonable basis it should be stricken. Arkansas-Missouri Power Co. v. Sain, 262 Ark. 326, 556 S. W. 2d 441.

The evidence presented in this case failed to disclose that there was any present demand for the sand to be mined from the property or that it could be economically mined under present conditions of demand and transportation costs. Absent such evidence, it was improper to permit the Dawsons' experts to render an opinion that the highest and best use of the land was the removal of the sand and the development of the land for recreational purposes. For that reason, the testimony should not have been admitted in evidence. Having admitted the evidence over objection, the trial court committed reversible error.

Having so disposed of the case on this assignment of error, it becomes unnecessary for us to consider any of the other assignments of error. The judgment of the trial court is reversed and the cause remanded with directions to grant a new trial in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., not voting.