LaMoine J. Kohl et al., doing business as Kohl Enterprises, appellees, v. State of Nebraska, Department of Roads, appellant.

334 N.W.2d 173

Filed May 13, 1983. No. 82-099.

Paul L. Douglas, Attorney General, and John E. Brown, for appellant.

Conway & Connolly, P.C., for appellees.

Krivosha, C.J., Boslaugh, McCown, White, Hastings, and Caporale, JJ., and Colwell, D.J., Retired.

White, J.

This is a proceeding in eminent domain in which the defendant, State of Nebraska, Department of Roads, took a fee title to .7 acres, a permanent easement to 9.35 acres, the plaintiffs' salvage yard in-

ventory, and all of the salvage yard fixtures and equipment. The purpose of the taking was to increase the right-of-way for U.S. Highway 281 and to prevent the continued operation of an automobile salvage yard on the plaintiffs' property.

The board of appraisers awarded the plaintiffs $209,702.30 as damages for the taking, which they appealed to the District Court. Trial was then held in the District Court solely on the issue of the fair market value of the real estate and personal property taken by the defendant. The jury returned a verdict for the plaintiffs in the amount of $110,000 for the fee title and easement and $280,000 for the personal property and fixtures. The defendant has appealed, claiming only that the District Court erred in the admission of evidence of the market value of plaintiffs' inventory. We affirm.

The plaintiffs, LaMoine J. and Mildred C. Kohl, doing business as Kohl Enterprises, were the owners of 10.05 acres which are rectangular in shape and which lie approximately 1 mile north of the city of Hastings in Adams County, Nebraska. The land is bordered by Highway 281 on the west and a county gravel road on the south.

The evidence at trial revealed that the highest and best use of the plaintiffs' property was the operation of a used car and parts salvage business. Kohl Enterprises had an inventory of approximately 1,835 vehicles, numerous used car parts, fixtures, and buildings. The plaintiffs' salvage business had been in existence since 1966 and had acquired grandfather rights under Neb. Rev. Stat. § 39-2606 (Reissue 1978) of the junkyards act. The 10.05 acres were zoned agricultural at the time of trial, and plaintiffs' salvage yard was being operated as a nonconforming use upon the land.

This case presents the unique issue of what the measure of damages is for the appropriation of an automobile salvage yard's inventory by a state agency in an eminent domain action. Normally,

"A taking by eminent domain does not include the personal property lying on the premises taken, but not affixed thereto . . . ." 27 Am. Jur. 2d *Eminent Domain* § 293 at 103 (1966); 4 Nichols on Eminent Domain § 13.13 (rev. 3d ed. 1979 & Supp. 1982).

The defendant has relied on Neb. Rev. Stat. § 39-2608 (Reissue 1978) as its statutory authority for the taking of the inventory in this case. The plaintiffs have not contested the defendant's authority for the taking on the record before us, they stipulated to the necessity of the taking, and neither side has briefed this issue to the court.

Thus, we are confronted with a situation where the State, whether its agency acted properly or not, has taken and disposed of the personal property of the plaintiffs and must provide just compensation. "Any exercise of the power of eminent domain is subject to the constitutional mandate, 'The property of no person shall be taken or damaged for public use without just compensation therefor.' Art. I, § 21, Constitution of Nebraska." *Campbell v. City of Lincoln*, 182 Neb. 459, 465, 155 N.W.2d 444, 449 (1968).

There is a substantial dispute in the evidence of the expert witnesses as to whether just compensation for the plaintiffs' used automobile inventory was the value of the salable parts on each of the 1,835 automobiles or whether it was the value of the automobiles taken as a bulk sale.

Plaintiffs' first expert witness was a certified public accountant who testified that plaintiffs were on a cash method of accounting because a used automobile as inventory would be an expense in the year it was purchased and not reflect income until parts were removed and sold from it. He compared the plaintiffs' business which did not remove parts from the vehicles until they were sold to other salvage yards which removed the parts immediately in an effort to save space and have as few vehicles on the premises as possible. He noted that the big distinction was the low labor cost in plaintiffs' method of

carrying on their business because they had land available to store the automobiles.

The plaintiffs' son, Brian Kohl, testified that he had worked with his father in the auto parts business since his father purchased the property in 1966. He also stated that he was familiar with every aspect of the business and that in the last 5 years he was more actively involved with the business than was his father. It was Brian Kohl's opinion that the best use for the 1,835 vehicles was for the major salable parts and not crushing, because crushing only occurs once all of the salable parts have been removed. At the time the 1,835 vehicles were taken by the State, the major salable parts had not been removed.

The third expert witness called by plaintiffs was the owner of a used auto parts business in Omaha, Nebraska. He examined each of the 1,835 automobiles and loose parts on plaintiffs' property to determine the fair market value on the basis of major salable parts. His opinion was that the fair and reasonable value of the used auto inventory and loose parts amounted to $770,000 on the date of the condemnation but that the parts would take 20 years to sell.

The accountant was then recalled to the stand to reduce the $770,000 figure to present value. He also determined that the parts would take 20 years to be sold, based upon the expert testimony and past sales by Kohl Enterprises. An interest rate factor of 8 percent was then picked, based upon interest rates of the past 5 to 7 years. He did not consider labor costs in subtracting expenses because the parts were not removed until the time of sale and the majority of parts were removed by the plaintiff and his son Brian. He did subtract real estate taxes, utilities, and wages as expenses. His opinion was that the present value of the 1,835 automobiles and loose parts was approximately $381,000 on the date of the taking.

The plaintiffs rested and the defendant called an

appraiser who gave his opinion that the fair market value of the automobiles and loose parts, if sold as a unit, was $72,980. However, it was the first time that he had appraised a salvage yard or major salable parts on automobiles, and his appraisal was made on the assumption that the salable parts had already been removed from the automobiles, which was contrary to the evidence presented.

The only other expert called by the defendant was not allowed to testify concerning the value of the inventory because he was only qualified as an expert in real estate and not personal property or inventory.

The defendant's primary contention on appeal is that the plaintiffs' inventory was valued by the major parts of each of the 1,835 automobiles rather than as a bulk sale, which is how the property would be sold to a willing buyer. The defendant also makes several other assertions based on this single assignment of error, which will be discussed herein.

In order to provide just compensation for the taking of personal property by a state or its agency, we find no reason not to apply the rules governing the measure of compensation for real property in a condemnation action to that of personal property. It is the general rule that in determining the fair and reasonable value of land taken under the power of eminent domain, the jury may consider what the land was used for at the time of taking, all uses for which it is adapted and to which it might be put, and award compensation based upon the most advantageous use possible. *Graceland Park Cemetery Co. v. City of Omaha*, 173 Neb. 608, 114 N.W.2d 29 (1962).

The record in the instant case was replete with evidence that there was a substantial difference between a salvage yard which buys and sells used automobile parts and a junkyard which buys and sells any type of metal on a per-pound scrap basis. Even the definitions contained in Neb. Rev. Stat. § 39-2602 (Reissue 1978) of the junkyards act so distinguish.

While the words junkyard and salvage yard are often used interchangeably, the evidence in the case at bar clearly revealed that the most advantageous use of the plaintiffs' inventory was for automobile parts and not for a scrap or junk value.

In a case that we find analogous to the case at bar, this court in *Graceland Park Cemetery Co. v. City of Omaha, supra,* sustained a judgment in which cemetery land was valued on an individual per-unit basis rather than upon the value the tract may have had when sold as a whole. In that case we stated at 612, 114 N.W.2d at 32: "[T]hat in the taking of land used for cemetery purposes the measure of damages is not the fair market value of the land for the simple reason that such property has no fair market value. Whenever the property is of such character and nature that it has no fair market value in the ordinary sense, its value for the uses and purposes to which it is being devoted and to which it is peculiarly adaptable may be shown."

While the value of a salvage yard's inventory has not previously been discussed, courts have commented about the unique value of salvage yard property. The Court of Claims of New York in *Innamorato v. State,* 65 Misc. 2d 440, 317 N.Y.S.2d 860, 863 (1971), stated: "By reason of zoning ordinances in the area it is difficult to establish an auto salvage yard where such a business has not been previously operated. Therefore, there is no question but that this particular parcel was more valuable than surrounding land because of its use as a junk yard."

The State of Nebraska, by the passage of the junkyards act, has restricted the number of salvage yards to those previously in existence and required the issuance of a permit in order to start a new operation. The evidence at trial revealed that even prior to the passage of the junkyards act, salvage yards were rarely bought and sold, because they were a stable and profitable investment for the

owner-operator. Salvage yard land may be readily marketable when cleared, but the inventory can only be sold to existing yards.

Thus, we believe that a salvage yard's inventory is not a type of property that is bought and sold on an open market and does not have a reasonable market value within the rule that the fair market value is the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell. We also believe that the plaintiffs used the correct formula for ascertaining the measure of damages, when the market value was not capable of being determined, by finding the total value of the major salable parts on each automobile, subtracting any expenses affecting said value, and reducing to present value for the deferred realization over the 20-year selling period that was determined in this case.

In a condemnation action tried before a jury, the presiding judge rules on the admissibility of evidence and other questions of law, while the jury determines questions of fact, such as the value of the property taken. 30 C.J.S. *Eminent Domain* § 286(2) (1965).

The trial judge admitted all of the relevant evidence that was presented bearing on the value of the inventory. He then instructed the jury to award the plaintiffs the value of the property based upon its most advantageous use. Even if the concept of just compensation did not mandate a separate valuation formula for unique property, the defendant has presented us with no evidence in the record to support its claim that the 1,835 automobiles could only be sold as scrap and not for their salable parts. Defendant's only expert that testified to the value of the inventory did so on the assumption that all of the salable parts had been removed from the automobiles.

It is clear the plaintiffs relied, prior to and during trial, on the valuation formula in *Graceland Ceme-*

*tery* to guide the jury in determining the value of the property taken.

The defendant further contends that the inventory of the plaintiffs was not valued as of the date of the taking because it would take 20 years to sell all of the parts from the inventory. We find that if the sales period can reasonably be projected over a term of years with the net sale price reduced to present worth, the compensation for the property is measured as of the date of the taking.

The defendant also complains that the plaintiffs' accountant was permitted to capitalize profits in order to arrive at the value of the inventory. In finding this contention to be without merit, we note that the accountant never valued the inventory; all he did was reduce to present value the inventory figure provided by another expert.

Finally, the defendant contends that the 8-percent interest rate utilized to reduce the inventory to present value was speculative, and therefore plaintiffs did not sustain their burden to prove damages by competent evidence per *Dawson v. Papio Nat. Resources Dist.*, 206 Neb. 225, 292 N.W.2d 42 (1980).

The general rule is that an expert witness, when properly qualified, may testify as to the valuation of the property, and the weight and credibility of what the witness considers in coming to his conclusion is for the jury to determine. *Iske v. Omaha Public Power Dist.*, 185 Neb. 724, 178 N.W.2d 633 (1970). The estimate as to what interest rate to use to reduce to present value has never been more than an educated guess on the part of an expert. The testimony of the plaintiffs' accountant was that 8 percent was a reasonable rate based upon the previous 5 to 7 years, and his testimony remained uncontroverted in the record. This contention is also without merit.

AFFIRMED.