LINCOLN BRANCH, INC., A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, V. CITY OF LINCOLN, NEBRASKA, A MUNICIPAL CORPORATION, APPELLEE AND CROSS-APPELLANT.
512 N.W.2d 379

Filed March 4, 1994.    No. S-92-427.

Charles D. Humble and Linda W. Rohman, of Erickson & Sederstrom, P.C., for appellant.

William F. Austin, Lincoln City Attorney, and Ernest R. Peo III for appellee.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

In this condemnation action, plaintiff-appellant and cross-appellee, the condemnee Lincoln Branch, Inc., appealed to the district court the $560,387.36 award made to it by the county court appraisers. Following trial, the district court, pursuant to verdict, entered judgment in the sum of $489,600 in favor of Lincoln Branch against defendant-appellee and cross-appellant, the condemnor City of Lincoln. Being dissatisfied with the amount of the judgment, Lincoln Branch appealed to the Nebraska Court of Appeals. We removed the matter to this court under the authority granted by Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 1992) to regulate our caseload and that of the intermediate court. Lincoln Branch asserts, in summary, that as the judgment is not supported by the evidence and is contrary to law, it is clearly wrong and must therefore be vacated and a new trial granted. The city, on the other hand, not only defends the judgment, but asserts in its cross-appeal that the district court erred in failing to (1) account for the fact that the city had, pursuant to the award of the appraisers, paid Lincoln Branch and its lienholder more than the verdict Lincoln Branch obtained and (2) assess costs against Lincoln Branch. We affirm as modified, and remand the cause with directions.

## II. SCOPE OF REVIEW

In *Harmony Lanes v. State*, 193 Neb. 826, 832, 229 N.W.2d 203, 207 (1975), we wrote:

> In a condemnation case, the weight and credibility of the testimony of lay or expert witnesses upon the issues of valuation and damages are for the jury. . . . The amount of damages sustained in a condemnation action is peculiarly of a local nature and ordinarily is to be determined by the jury. Where the evidence is conflicting this court will not ordinarily interfere with the verdict of the jury unless it is clearly wrong.

Accord, *City of Hastings v. Peter Ellis Farms*, 216 Neb. 550, 344 N.W.2d 640 (1984); *Wear v. State of Nebraska*, 215 Neb. 69, 337 N.W.2d 708 (1983). We have also declared:

> [I]n determining the sufficiency of the evidence to sustain

a verdict, the evidence must be considered most favorably to the successful party, every controverted fact must be resolved in his favor, and he is entitled to the benefit of any inferences reasonably deducible from it. A jury's verdict will not be disturbed unless it is clearly wrong.

*Zwygart v. State*, 230 Neb. 128, 132-33, 430 N.W.2d 301, 304 (1988).

## III. FACTS

Lincoln Branch purchased that portion of an abandoned railroad right-of-way commencing at the city's 35th Street just north of Vine Street and ending approximately 560 feet east of 84th Street. Lincoln Branch paid $1,940,947 for the realty, which is 100 feet wide along most of its length but has segments which are 125 feet, 150 feet, and 200 feet wide.

Prior to the purchase of the subject realty, Lincoln Branch reviewed an appraisal prepared for the seller, which valued the realty at $2,150,000, based on the premise that the highest and best use of the realty was as a corridor. The seller's appraiser recited that "discontinuation of the corridor would result in land sections that are inconsistent in terms of development with adjoining property [and] would produce [an] uneconomic use of the lands."

Although Lincoln Branch admits that it purchased the realty as a corridor, it determined to subdivide it and sell some portions, develop some of the segments itself, and sell other portions to developers. Lincoln Branch's president had previously purchased other abandoned railroad rights-of-way, which he divided into parcels and sold at a profit, and at the time of Lincoln Branch's purchase of the realty, he was aware of interest in several tracts for commercial development. He was also aware that the city was interested in placing a bike path on the subject realty, recognized the city's commitment to bike paths, and knew that the city had purchased a 4-mile path in the south part of the city for $1,450,000. He expected to be treated fairly should the city seek to obtain a portion of Lincoln Branch's realty for such a path.

After several meetings between representatives of the city and Lincoln Branch's president, Lincoln Branch received a

letter advising that the city wished to acquire an easement for a bike path along the center of the realty. Although the city later agreed to deviate from the center in certain areas, the easement, as condemned, remains, for the most part, along the center. The deviations include points near 35th Street, where the easement commences at the south edge of the realty, then merges to the middle; between 48th and 56th Streets, where the easement is nearer to the south edge; east of 56th Street, where the easement crosses closer to the north edge of the realty and then, within a few blocks, crosses back toward the south side; between 66th and 70th Streets, where the easement, at the request of Lincoln Branch, lies near the northwest side of the realty; and, finally, southeast of O Street, where the easement passes over the street at the railroad bridge and lies at the southwest side of the realty.

Lincoln Branch's expert testified that although the highest and best use of the realty may at one time have been as a corridor, there is but a small likelihood that there now exist any such users other than the city, and that the expert knew of two other railroad rights-of-way abandoned in Lincoln which are being divided into and sold as segments. Moreover, the character of the subject realty as a corridor was broken by a lumberyard's purchase of a portion of the right-of-way to the west of 35th Street, where Lincoln Branch's realty now begins. Furthermore, the fact that the easement meanders across the realty diminishes its use as a corridor.

Therefore, in estimating the before- and after-taking value, Lincoln Branch's expert divided the realty into segments designed to achieve the highest and best uses to which the various portions of the realty could be put and to produce maximum marketability. The segmentation was based upon the existence of intersecting streets, the similarity of zoning classifications, the useability of the land within the segment, and the grade of the land. The highest and best uses of the resulting 18 segments varied. In his opinion, the easement reduced the realty's before-taking value of $1,795,430 by $1,068,050.

Predictably, the city's expert used a different approach. He rejected the over-the-fence appraisal method used by Lincoln Branch's expert, which would value the realty the same as the

abutting land. Since the realty is often to the rear of the abutting lot and may not match the topography of the abutting land, the city's expert used the "abutter's value" method, which values land based upon how much it could enhance the abutting property. Because of the land cuts made and fill used to create the roadbed for the railroad's use, in the view of the city's expert a large portion of the realty would require such extensive grading that development for other than corridor uses was not economically feasible. Thus, not only did the city's expert conclude that the highest and best use of the realty was as a corridor, but he also valued various segments of the realty for other than corridor uses differently than did Lincoln Branch's expert. In the opinion of the city's expert, the easement reduced the realty's before-taking value of $1,853,000 by $488,600.

## IV. ANALYSIS OF LINCOLN BRANCH'S APPEAL

The measure of compensation for land taken for public use is the fair market value of the land actually appropriated and the difference in the fair and reasonable market value of the remainder of the land before and after the taking. *Lantis v. City of Omaha*, 237 Neb. 670, 467 N.W.2d 649 (1991); *Harmony Lanes v. State*, 193 Neb. 826, 229 N.W.2d 203 (1975); *Hughes Farms, Inc. v. Tri-State G. & T. Assn., Inc.*, 182 Neb. 791, 157 N.W.2d 384 (1968); *Berlowitz v. State*, 180 Neb. 164, 141 N.W.2d 764 (1966).

Fair market value "is the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell." *Kohl v. State of Nebraska*, 214 Neb. 348, 354, 334 N.W.2d 173, 178 (1983).

In determining the fair market value of the property taken, it is appropriate to consider its highest and best use. As written in *Sump v. Omaha Public Power Dist.*, 168 Neb. 120, 123, 95 N.W.2d 209, 212 (1959):

> In determining the fair and reasonable value of land before and after it is damaged by a taking of an easement under the power of eminent domain it is proper for the jury to consider the purposes for which it was being used at the time it was damaged, and all uses for which it is adapted and might be put, and award compensation upon

the basis of its most advantageous and valuable use. The evidence that is proper to be considered in establishing such value is discussed in Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168, as follows: "The court properly admitted evidence of the nature of the community and its development into acreage or small tracts for country or suburban homes and the adaptability of the land in question for that purpose. The market value of property includes its value for any reasonable use to which it may be put. If, by reason of its surroundings, or its natural advantages, or its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which made up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating compensation. The proper inquiry is, what is its fair market value in view of any reasonable use to which it may be applied and all the reasonable uses to which it is adapted?"

Accord *Leffelman v. City of Hartington*, 173 Neb. 259, 113 N.W.2d 107 (1962). See *Danish Vennerforning & Old Peoples Home v. State*, 191 Neb. 774, 217 N.W.2d 819 (1974).

Furthermore, if the evidence as to whether the property is adaptable for a certain use is in conflict, it is the jury's province to determine which highest and best use and resulting valuation are more credible. *Pieper v. City of Scottsbluff*, 176 Neb. 561, 126 N.W.2d 865 (1964). See *State v. Dillon*, 175 Neb. 444, 122 N.W.2d 223 (1963).

In reviewing the amount of damages awarded, we have observed: " 'Ordinarily, a verdict or award in a condemnation case will be sustained if . . . it is within the range of the testimony of the amount of the value or damages.' " *Zwygart v. State*, 230 Neb. 128, 133, 430 N.W.2d 301, 305 (1988). See, also, *State v. Dillon, supra*. Indeed, an expert witness' testimony as to the value of land taken is purely advisory and is not binding on the trier of fact. *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 157 N.W.2d 887 (1968).

Lincoln Branch urges, in essence, that the testimony of the city's expert that the realty's highest and best use is as a corridor

is clearly wrong and must be rejected as a matter of law. The testimony is troubling. For example, the city's expert witness acknowledged that his own market analysis demonstrated there presently exists no current market for corridor uses. When a market exists, it is limited and consists primarily of municipalities and common carriers having a need to lay pipelines or the like. He offered nothing to show it is economically feasible to cover the holding costs while waiting for such a market to develop. In fact, these holding costs are the very costs he said preclude holding the realty until it could be sold in parcels for development, a matter he conveniently overlooks when testifying as to the highest and best use for the realty.

However, whether the opinion of the city's expert concerning the damage caused by the taking should have been considered by the jury is not before us. Lincoln Branch neither objected to the opinion on the ground that it was factually unsupported and thus speculative and conjectural, nor moved to strike it on that ground. See, Neb. Evid. R. 103 and 705, Neb. Rev. Stat. §§ 27-103 and 27-705 (Reissue 1989); *Clearwater Corp. v. City of Lincoln*, 202 Neb. 796, 277 N.W.2d 236 (1979) (expert testimony should not be received if appears witness not in possession of facts enabling expression of reasonably accurate conclusion as distinguished from guess or conjecture). See, also, *Boynton v. Canal Authority*, 311 So. 2d 412 (Fla. App. 1975) (error not to strike testimony of appraiser relating to remaining rights of landowners where no evidence to support appraiser's interpretation); *Commonwealth, Department of Highways v. Harvey*, 396 S.W.2d 311 (Ky. App. 1965) (error not to sustain motion to strike unsupported opinion of value), *criticized on other grounds, Commonwealth, Department of Highways v. Baker*, 442 S.W.2d 290 (Ky. App. 1969).

Where testimony of an expert regarding the valuation of real estate in a condemnation action is admitted without objection by the opponent, the opponent may not on appeal seek to impeach the foundation of that testimony and destroy the admissibility of the evidence to argue that the proffered evidence does not support the verdict. See, *Johnson v. Nebraska Public Power Dist.*, 187 Neb. 421, 191 N.W.2d 594

(1971); *Jensen v. State*, 184 Neb. 802, 172 N.W.2d 607 (1969). Once admitted without objection, the weight and credibility of the expert's valuation testimony is a question for the jury. *Iske v. Metropolitan Utilities Dist., supra.*

As we have recently reaffirmed, if, when inadmissible evidence is offered, the party against whom such evidence is offered consents to its introduction, or fails to object or to insist upon ruling on the objection to introduction of such evidence, and otherwise fails to raise the question as to its admissibility, that party is considered to have waived whatever objection he or she may have had thereto, and the evidence is in the record for consideration the same as other evidence. *In re Application of Jantzen, ante* p. 81, 511 N.W.2d 504 (1994). This is an application of the principle that one cannot silently tolerate error, gamble on a favorable result, and then complain that one guessed wrong. *State v. Rodriguez*, 244 Neb. 707, 509 N.W.2d 1 (1993); *Pitt v. Checker Cab Co.*, 217 Neb. 600, 350 N.W.2d 507 (1984); *Johnson v. Nebraska Public Power Dist., supra.*

There is no merit to Lincoln Branch's challenge to the judgment.

## V. ANALYSIS OF CITY'S CROSS-APPEAL

The foregoing determination makes it necessary that we consider the city's cross-appeal.

### 1. PRIOR PAYMENT

As noted in part I above, in accordance with the award of the appraisers, the city paid Lincoln Branch and its lienholder $70,787.36 more than the verdict.

Neb. Rev. Stat. § 76-719.01 (Reissue 1990) provides that if, under such circumstances, "the compensation finally awarded . . . is less than the amount of the money . . . received by the condemnee, the court shall enter judgment against the condemnee for the amount that the condemnee has been overpaid, together with interest at the rate provided" by law. Thus, in entering its judgment, the district court erroneously failed to deduct from the verdict the excess the city had paid Lincoln Branch and its lienholder and to calculate the interest due thereon. See *Clearwater Corp. v. City of Lincoln*, 207 Neb. 750, 301 N.W.2d 328 (1981) (approves calculation of

overpayment and interest).

## 2. COSTS

Next, the city argues that as the judgment was less than the amount awarded by the appraisers, it was entitled to an award of its costs.

The city is correct. Neb. Rev. Stat. § 76-720 (Reissue 1990) provides, in relevant part: "If appeal is taken by the condemnee only, he or she shall be charged with such costs if the final judgment is not greater than the award of the appraisers." The costs are defined elsewhere in the statute to be a reasonable sum for attorney fees and for fees necessarily incurred for not more than two expert witnesses. *Keller v. State*, 184 Neb. 853, 172 N.W.2d 782 (1969), teaches that the calculation as to whether the judgment exceeds the amount awarded by the appraisers is to be made without reference to interest.

While under certain other circumstances § 76-720 leaves the matter of assessing costs to the discretion of the district court, it is crystal clear from the foregoing language that when a condemnee as the sole appealing party fails to obtain a judgment which is larger than the award of the appraisers, the condemnee must be assessed the statutorily defined reasonable costs.

## VI. JUDGMENT

For the foregoing reasons, the cause is remanded to the district court with directions that its judgment be modified in accordance with this opinion.

AFFIRMED AS MODIFIED, AND CAUSE
REMANDED WITH DIRECTIONS.

WHITE, J., not participating.
BOSLAUGH, J., concurs in the result.